### In re GRANT.

#### (District Court, S. D. New York. August 2, 1912.)

**1. WITNESSES (§ 308*)—PRIVILEGE—PRODUCTION OF DOCUMENTS.**

The privilege against incrimination in the case of corporate records depends upon the nature of the record itself, not upon the lawfulness of the custody in which they happen to be.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 1065–1067; Dec. Dig. § 308.*]

**2. WITNESSES (§ 204*)—CONFIDENTIAL RELATIONS—PRODUCTION BY ATTORNEY OF DOCUMENTS OF CLIENT.**

Where a witness declined to produce books in his possession on the ground that they were delivered to him in his professional character as a lawyer by a client, it is no defense to his claim of privilege that the books were the property of a corporation, of which the client was the sole stockholder.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 759, 760, 762; Dec. Dig. § 204.*]

**3. WITNESSES (§ 204*)—PRIVILEGE—CONFIDENTIAL RELATIONS—ATTORNEY AND CLIENT.**

An attorney cannot assert a privilege to refuse to produce books of a client in his possession where they were not delivered to him for the purpose of consultation or otherwise in his professional capacity, but to avoid their seizure by the authorities, and he may be compelled to open a package supposed to contain them, although instructed to the contrary by his client.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 759, 760, 762; Dec. Dig. § 204.*]

Proceedings for contempt against Walter B. Grant, an attorney at law, for refusing to produce documents as a witness. Finding against respondent's claim of privilege.

William A. Keener and Dallas Flannagan, for Walter B. Grant.

Henry A. Wise, U. S. Dist. Atty. (Robert Stephenson, of counsel), for the United States.

HAND, District Judge. [1] In Wilson v. U. S., 221 U. S. 361, 31 Sup. Ct. 538, 55 L. Ed. 771, Wilson originally had custody of the corporate records as president; but before the second presentment of the grand jury the directors had demanded them of him, and he had refused to deliver them. Therefore the first subpœna went before the demand, the second after, but the court did not distinguish. Now with the first I have here no concern, because, while Wilson did not maintain any possession against the corporation, his custody was the corporation's, and the only question was whether he could protect himself from self-incrimination through that fact. That too was Dreier's Case, 221 U. S. 394, 31 Sup. Ct. 550, 55 L. Ed. 784, which was decided at the same time as Wilson's. However, after Wilson assumed personal possession of the books, a different question arose. The court might have said that his possession would be respected as privileged, whether as against the corporation it was lawful or not, and that, until the corporation had got back the books from Wilson's wrongful possession, no writ should go. That would have been to

deny the privilege to the corporation only, but to allow it to the individual no matter what was the original character of the books. Of course, such a result would have been most undesirable in practice, and yet I think that it would necessarily be the result if the papers had not been public in character. For instance, suppose that A., knowing that B. has papers which would incriminate him, gets wrongful possession of them from B., whom they do not incriminate. If B. is content, and leaves A. in possession, I do not understand that it would be any answer whatever to A. to say: "You cannot keep these back, because you came by them wrongfully, or at least you have no right to them now." All the law considers is whether A. has got possession in fact, and whether the documents actually will tend to incriminate him. To get them in evidence the law would have to force him to bring them out of a possession which is good 'enough against any one but B. Certainly, I can find nothing in the books which suggests such a distinction, and it contradicts the whole history of the matter. For the privilege runs along side by side with the power to compel production, and that power depends only upon serving the actual possessor. There are cases to be sure where one having custody is not required to produce, but it is only because his custody is so subordinate as not to justify his meddling with documents even to bring them to court. Certainly, a full possessor of the documents is always subject to subpœna, whether his possession is lawful or unlawful, and regardless of ownership.

Now the Supreme Court paid no attention whatever to this distinction, for they put the decision upon the quasi public character of the record when it was originally made, which, as I read it, subjected it as a document to production in any one's hands, whether it hurt him or not to discover it. That certainly is the burden of Mr. Justice Hughes' opinion, and, for the reasons I have given, I think it is the logic of the decision. If so, the question of legal title does not matter; indeed, this case shows how little it should. For the respondent concedes that Burlingame would have had to produce these books during the years 1908 and 1909, merely because he had no legal title, though he owned all the stock; but he insists that the passage of title makes the whole difference. Surely that is very dry straw.

[2] However, the referee made a finding on the question of title, and the parties seem to think that my finding may affect the scope of an appeal, though it really is only a matter of legal conclusion from undisputed evidence. The respondent relies upon Burlingame's assumption of ownership when he delivered the books to Granger for storage, coupled with his previous expression of intention to take them over as his own. Was there an adequate delivery of the property? Since Burlingame already had possession, all that was needed was words in præsenti (Kilpin v. Ratley, 1892, 1 Q. B. 582; Allen v. Cowan, 23 N. Y. 502, 80 Am. Dec. 316); indeed, not even words were necessary, if there were any other act which showed the purpose. Nor was it as though only the separate stockholders signed a consent, for Burlingame was the corporate manager vested with all powers as well as the sole stockholder. No one disputes that a bill

of sale on behalf of the corporation signed by him would have served. Whether he had formal authority or not, he had actual authority to bind the corporation. How must his acts be interpreted, if one believes his testimony? I think they should be interpreted like those of an executor who is sole legatee and who begins to use the goods after he had advertised for debts, and paid them off. Blood v. Kane, 130 N. Y. 514, 29 N. E. 994, 15 L. R. A. 490; In re Mullon, 145 N. Y. 98, 39 N. E. 821. The title is in the individual. There may be a fictitious executorial "persona" or not; there may be corporate "persona." Certainly, for most purposes it is better to speak in the simpler terms which such ideas permit, but I will not force the necessity of form so far as to hold that when the sole stockholder stops the business, pays the debts, takes over possession of the property, and announces that he has wound up the corporation, he must either execute a bill of sale to himself or make a public declaration of gift from the corporation. I concede this, if, as in the case of realty, some writing was a necessary form to the passage of title; but, where the law allows it to be all done in pais, such conduct as this will answer all the requisite forms.

However, all this is a very barren and futile inquiry from any point of view, because, whether Burlingame had title or not, he certainly had the right to keep the possession which he already had, and if the case of Wilson v. U. S., supra, turns in any sense upon the fact that Wilson was a trespasser quoad his corporation, then the only material consideration here is that Burlingame had absolute right of possession as against every one, including himself in his incorporated persona.

[3] The next question is whether Grant held the box and packages bona fide as attorney and for purposes of consultation, or whether they were given him to avoid seizure by the authorities. Much, perhaps most, of the testimony was taken upon this issue before an unusually capable and careful referee who has found that the deposit was made without any intention to use the books for purposes of consultation. He saw the witnesses, and his conclusion I shall accept. The testimony of McLean is certainly valueless, even in type, because what he says is a hopeless jumble of words for the most part, and for the rest so uncertain and vague as to be unreliable. Burlingame's own testimony was most contradictory, and his interest entitled the referee to disregard it. As to the respondent's own testimony, he feels clear now that his original instructions included consultation; but he concedes that, as to a part of the conversation he is vague, i. e., whether he originally received the injunction not to open them. His first impression certainly was that he had no such right from the original circumstances of their deposit with him. There was a probable reason for getting the books out of Burlingame's hands which did not include any consultation, and in fact no consultation ever occurred. I must confess that on a mere reading of the testimony I should not have come to the same conclusion as the referee, but there was enough in the case to justify his conclusion that the claim of professional privilege was not made out, giving that conclusion the benefit to which it is entitled from the fact that he could so much better

get the actual sense of the situation. Questions of credibility and the value of the recollection of witnesses should always, except in clear cases, remain as they are determined by the tribunal which actually sees them.

Since the respondent has been found not to have received the boxes as a lawyer, he has no privilege to decline to answer whether or not they are the books mentioned in the subpœna, and Burlingame's injunction to the contrary cannot prevail over the demands of justice. It is not Burlingame who is compelled to act in a testimonial character, but Grant, who did not receive them within his professional privilege.

Therefore the respondent will be required in this proceeding to examine the box and packages without injuring their wrappings and to answer the question whether they contain any of the books mentioned in the subpœna. If so, he will hold these subject to the order of a new subpœna to produce the books as evidence. He is fined in any event the costs of this proceeding; that is, the referee's and stenographer's fee. If he should decline to produce the books upon another subpœna, the March grand jury having adjourned, a summary motion upon that subpœna will at once be followed by a committal; but there is no need in this proceeding to go further.

I confirm all the findings of the referee except the seventh. An order may be entered in accordance with this opinion.