**UNITED STATES of America et al.,
Appellants,**

**v.**

**Carl COHEN, Appellee.**

**No. 20921.**

United States Court of Appeals
Ninth Circuit.

Dec. 19, 1967.

Richard M. Roberts, Dept. of Justice, Washington, D. C. (argued), Joseph L. Ward, U. S. Atty., Las Vegas, Nev., Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, Meyer Rothwacks, John M. Brant, Attys., Dept. of Justice, Washington, D. C., for appellants.

Adrian B. Fink, Jr. (argued), Cleveland, Ohio, for appellee.

Before BARNES, HAMLIN, and BROWNING, Circuit Judges

BROWNING, Circuit Judge:

Samuel Berke, an accountant with offices in Beverly Hills, California, performed accounting and general business services for Carl Cohen of Las Vegas, Nevada. On July 8, 1964, Berke had in his possession work papers which he had compiled from data supplied orally and in writing by Cohen, as well as copies of correspondence between the two men and other documents pertaining to these services. On that day, July 8, 1964, Special Agents C. L. Beason and J. R. Chamberlain of the Internal Revenue Service called on Cohen in Las Vegas and asked to see Cohen's records pertaining to his tax liability for the years 1958 through 1963. Cohen told the agents that Berke had them. The following. day Cohen went to Beverly Hills and requested and obtained the records from Berke. Four days later Beason demanded the records from Berke, and was informed that Cohen had picked them up. Beason requested Berke to ask Cohen for their return. Berke complied. Cohen declined to return the papers.

On September 29, 1964, Beason served Cohen with a summons, issued under section 7602, I.R.C.1954, 26 U.S.C. § 7602 (1964), to appear before Beason on October 12, 1964, and produce the papers which Cohen had obtained from Berke on

July 9.[1] Cohen appeared but declined to produce the documents described in the summons on the ground that to do so might tend to incriminate him.

Beason filed a petition in the district court for enforcement of the summons pursuant to section 7604(a), I.R.C.1954, 26 U.S.C. § 7604(a) (1964). After an evidentiary hearing, the district court quashed the summons. United States v. Cohen, 250 F.Supp. 472 (D.Nev.1965). The government appeals. We affirm.

■ The Fifth Amendment commands that "No person * * * shall be compelled * * * to be a witness against himself." It is obvious that the government seeks to compel Cohen to produce the described documents without regard to his wishes. It has been the law for at least eighty years that compelled produc-

tion of documents falls within the ambit of the privilege.[2] It is conceded that the documents demanded here might be used by the government against Cohen in a future criminal proceeding.[3] Moreover, since the documents themselves are incriminating, their very production pursuant to the description in the summons would constitute an incriminating admission of their identity and authenticity.[4] Clearly, recognition of the privilege in this case would serve most of the purposes of the privilege, recently restated in Murphy v. Waterfront Comm'n, 378 U.S. 52, 55, 84 S.Ct. 1594, 1596, 12 L.Ed. 2d 678 (1964):

It reflects many of our fundamental values and most noble aspirations: our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt;

1. The summons described the papers as follows:
   1. All accounting work papers, statements, records, schedules, abstracts, analyses, and compilations prepared by Samuel Berke, C.P.A., or by members of his firm relating to your income tax liabilities for the years 1958 through 1963, which you obtained from Mr. Berke on July 9, 1964.
   2. All correspondence files of Samuel Berke relating to accounting and general business services performed by his firm for you during the years 1958 to the present time, which you obtained from Mr. Berke on July 9, 1964.

2. Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886).

3. The privilege has not been limited to documents prepared by the claimant himself or containing his own incriminating statements of fact. Wilson v. United States, 221 U.S. 361, 378, 31 S.Ct. 538, 55 L.Ed. 771 (1911); Maguire, Evidence of Guilt § 2.04, at 22 (1959); Mansfield, The Albertson Case, Sup.Ct.Rev. 103, 126–28 (1966).
   Professor Mansfield raises the question of whether the emphasis on testimonial or communicative use in Schmerber v. State of California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (see also Warden v. Hayden, 387 U.S. 294, 302–303, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); United States v. Wade, 388 U.

S. 218, 222, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); and Gilbert v. State of California, 388 U.S. 263, 266–267, 87 S. Ct. 1951, 18 L.Ed.2d 1178 (1967)), may foreshadow change in this area. But even if the privilege were to be restricted to papers containing verbalizations by the claimant of his own state of mind, or were to be held inapplicable even to these on the ground that the statements reflected in such papers were not compelled, the privilege would still seem to be available for the second aspect mentioned in the text, namely, the identification and verification of the papers by the claimant which is necessarily implicit in their production under the compulsion of the subpoena. See note 4. This is apparently what the Court had in mind when it stated in Schmerber: "It is clear that the protection of the privilege reaches an accused's communications, whatever form they might take, and the compulsion of responses which are also communications, for example, compliance with a subpoena to produce one's papers" 384 U.S. at 763–764, 86 S.Ct. at 1832. (Emphasis added.)

4. Curcio v. United States, 354 U.S. 118, 125, 77 S.Ct. 1145, 1 L.Ed.2d 1225 (1957); 8 Wigmore, Evidence § 2264, at 379–80 (McNaughton rev. 1961); Maguire, Evidence of Guilt § 2.04, at 22 n. 3 (1959). See also United States v. White, 322 U.S. 694, 698, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944).

our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates "a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load," * * * our respect for the inviolability of the human personality and of the right of each individual "to a private enclave where he may lead a private life," * * * our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes "a shelter to the guilty," is often "a protection for the innocent."[5]

The government nonetheless contends that the privilege should not apply in this case, for two basic reasons.

### I

■ The substance of the government's first contention is that the privilege against self-incrimination applies only to papers which are held by the claimant free of any duty to surrender them to another. Since, according to the government, Cohen held the papers subject to a duty to surrender them to Berke, Cohen could not claim the privilege.[6]

■ The government rests this contention principally upon United States v. White, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944), in which the Court held that an officer of a labor union could not avail himself of the privilege to avoid producing his union's records because they might tend to incriminate him; and Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771 (1911), in which the Court held that a corporate officer could not claim the privilege to avoid the production of his corporation's records. The government reads these cases as denying the protection of the privilege to the officer-claimant because he held the records subject to an obligation to relinquish them to the organization which owned them. We read them rather as an extension of the rule that the privilege against self-incrimination is available to protect only the personal interests of natural persons and not group interests embodied in impersonal organizations.[7] Custodians of organizational records may not frustrate the public policy underlying the organization's lack of privilege by withholding the organization's official records from examination by public authorities under a claim of personal privilege. This rationale is obviously inapplicable to the present case.[8]

---

5. Of course, there is nothing in this case that arouses "our fear that self-incriminating statements will be elicited by inhumane treatment and abuses."

6. The district court found that Cohen held the documents "in his rightful and indefinite possession in a purely personal capacity"; and that this was "sufficient to entitle him to invoke the privilege against self-incrimination; and there was "no need to determine the ownership of the work papers." 250 F.Supp. at 475. The government contends that at the very least the case should be remanded for a determination of the issue of title.

7. Thus, in United States v. White, 322 U.S. at 700, 64 S.Ct. at 1252: "The scope and nature of the economic activities of incorporated and unincorporated organizations and their representatives demand

that the constitutional power of the federal and state governments to regulate those activities be correspondingly effective. The greater portion of evidence of wrongdoing by an organization or its representatives is usually to be found in the official records and documents of that organization. Were the cloak of the privilege to be thrown around these impersonal records and documents, effective enforcement of many federal and state laws would be impossible." See also Wilson v. United States, 221 U.S. at 380–382, 31 S.Ct. 538; United States v. Silverstein, 314 F.2d 789, 791 (2d Cir. 1963).

8. The distinction between *White* and *Wilson* and the present case may be stated another way. Return of the *White* and *Wilson* papers to the owning principal

██ As the government recognizes, the rule it suggests would make ownership of subpoenaed documents virtually essential to a claim of privilege, for ordinarily only the owner will be able to assert a right to possession superior to all others. But it is possession of papers sought by the government, not ownership, which sets the stage for exercise of the governmental compulsion which it is the purpose of the privilege to prohibit. The "cruel trilemma" of perjury, contempt, or self-incrimination, of which the Court spoke in Murphy v. Waterfront Comm'n, faces the individual whenever the government seeks to compel him to produce papers in his possession, for he must then either falsify, accept punishment for contempt, or yield. Lack of title does not free him from this choice.[9] Possession of potentially incriminating documents is thus the necessary and sufficient condition of the privilege, for the compelled production, identification, and authentication of incriminating materials by the possessor will incriminate him, whether or not the documents are his.[10]

It is difficult to see how this conclusion could be affected by the fact that the papers were owned by another who had the right to demand their return. The owner's demand would not involve compulsion by the state, and compliance with it would not incriminate the possessor. The considerations upon which the right depends therefore would not apply, even though the documents might thereafter be obtained by the government from the owner. "[T]he sentiments which bar the *state* from requiring a person to deliver to it a self-incriminating document are logically unrelated to the fact that someone *else*, using methods and for reasons not giving rise to those same sentiments, can require the person to deliver up the document to that someone else." 8 Wigmore, Evidence § 2259b, at 360 (McNaughton rev. 1961).[11]

---

would have automatically turned the papers over to the government, for the government clearly had a right to the papers free of any claim of privilege when the papers were in the "hands" of the corporation or the union. The Court held that the officers could not abrogate the government's right. But no such right is present here; in Berke's hands, the government's right would be conditioned on whether Berke claimed privilege in the papers. The papers sought to be withheld are not open to government inspection but for their being withheld by a fiduciary; they are not papers already determined to be available to the government independent of the privilege against self-incrimination.

9. Ownership, without possession, of course, does not give rise to a claim of the privilege, for although the owner may watch with regret the giving up of his materials to the government by their possessor, the compulsion which underlies their surrender is not exercised against him and requires no incriminating disclosure, express or implicit, on his part—*he* need not choose among self-accusation, contempt, or perjury. The privilege prevents self-incrimination, not incrimination itself. Johnson v. United States, 228 U. S. 457, 33 S.Ct. 572, 57 L.Ed. 919 (1913) (Mr. Justice Holmes): "A party is privileged from producing the evidence, but not from its production." Id. at 458, 33 S.Ct. at 572. "If the documentary confession comes to a third hand *alio intuitu*, as this did, the use of it in court does not compel the defendant to be a witness against himself." Id. at 459, 33 S.Ct. at 572. See also Ex Parte Fuller, 262 U.S. 91, 93–94, 43 S.Ct. 496, 67 L. Ed. 881 (1923); Dier v. Banton, 262 U.S. 147, 149–150, 43 S.Ct. 533, 67 L.Ed. 915 (1923); Perlman v. United States, 247 U.S. 7, 15, 38 S.Ct. 417, 62 L.Ed. 950 (1918); Remmer v. United States, 205 F.2d 277, 285 (9th Cir. 1953), rev'd on other grounds 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954).

10. Application of House, 144 F.Supp. 95, 101 (N.D.Cal.1956); Fahey, Testimonial Privilege of Accountants in Federal Tax Fraud Investigations, 17 Tax.L.Rev. 491, 504 (1962); Meltzer, Required Records, The McCarran Act, and the Privilege against Self-Incrimination, 18 U.Chi.L. Rev. 687, 706–08 (1951); 8 Wigmore, Evidence § 2264, at 379–80 (McNaughton rev. 1961). See also United States v. Foster, 16 A.F.T.R.2d 5121 (W.D.Tex. 1965); Application of Daniels, 140 F. Supp. 322, 327 n. 5 (S.D.N.Y.1956). See note 17.

11. See also Cohen, Accountants' Workpapers in Federal Tax Investigations, 21 Tax L.Rev. 183, 199 n. 52, 200 n. 53 (1966). It may be argued that since

It has been suggested[12] that if the owner were served with a summons he would be required to retrieve the papers from the possessor for production in compliance with the summons;[13] that the possessor could neither refuse to return the papers to the owner nor prevent the owner from submitting the papers to the government on the ground that they would tend to incriminate the possessor; and that the government should be permitted to accomplish directly by serving the summons upon the possessor what it could in any event accomplish indirectly by serving the owner.

The suggestion overlooks the fact that if the owner is a natural person, as in our case, he might himself, after acquiring possession, assert the privilege and refuse to produce the papers.[14] Moreover, it misses the point to argue that since the government might obtain the papers by another means it should be permitted to compel the possessor to produce them over his claim of privilege [15]—that the government might obtain these documents without compelling Cohen to incriminate himself is hardly a justification for compelling Cohen to incriminate himself. We cannot ignore the dictates of the Fifth Amendment on the ground that it would be more convenient or efficient to do so.

■ In a slight variation of its basic theme, the government argues that Berke's request to Cohen to return the papers rendered Cohen's possession "wrongful" and therefore insufficient to support a claim of privilege.[16]

There is authority that possession of incriminating documents is sufficient to support the privilege even though the possession is wrongfully acquired and the owner has requested that the documents be returned.[17] The logic of the

---

seizure by the state armed with a proper warrant does not involve compelled *self-incrimination* and since the decision in Warden v. Hayden, 387 U.S. 294, 87 S. Ct. 1642, 18 L.Ed.2d 782 (1967), abolished the "mere evidence" rule, refusal to permit the government to obtain the documents sought here by its summons unduly exalts form. One of many answers to this contention is that the Fourth Amendment has its own set of protective limitations, including those of specificity and probable cause.

12. See, e.g., Fahey, Testimonial Privilege of Accountants, 17 Tax L.Rev. 491, 504 (1962); Meltzer, Required Records, 18 U.Chi.L.Rev. 687, 707 (1951).

13. The record indicates that the government served Berke with a summons. It does not appear whether any effort was made to enforce it.

14. See note 8.

15. Cf. Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920): "But the rights of a corporation against unlawful search and seizure are to be protected even if the same result might have been achieved in a lawful way."

16. The government relies principally upon the pronouncement in Deck v. United States, 119 U.S.App.D.C. 240, 339 F.2d 739, 740–741 (1964), "that one who holds papers against the owner's demands for their return cannot resist production by claiming the privilege against self-incrimination." Compare In re Fahey, 300 F. 2d 383 (6th Cir. 1961).

17. Judge Learned Hand in In re Grant, 198 F. 708, 709 (S.D.N.Y.1912), aff'd 227 U.S. 74, 33 S.Ct. 190, 57 L.Ed. 423 (1913), noted that in Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L. Ed. 771 (1911), the documents belonged to the corporation and the directors had demanded their return but the Supreme Court did not place its decision upon either ground, but rather upon the quasi-public character of the corporate books. Explaining why neither lack of title nor a demand to relinquish possession would be sufficient to deny the privilege, Judge Hand said:
For instance, suppose that A., knowing that B. has papers which would incriminate him, gets wrongful possession of them from B., whom they do not incriminate. If B. is content, and leaves A. in possession, I do not understand that it would be any answer whatever for A. to say: "You cannot keep these back, because you came by them wrongfully, or at least you have no right to them now." All the law considers is whether A. has got possession in fact, and whether the documents actually will tend to incriminate him. To get them in evidence the law would have to force him to bring them out of a possession which is good enough against any one

privilege supports this view, for, as we have said, the exercise of governmental power which the privilege was intended to bar occurs whenever, without more, a person is compelled to identify, authenticate, and produce documents which may tend to incriminate him.

In any event, Cohen's possession cannot fairly be characterized as wrongful. Berke testified without contradiction that he considered all papers relating to his clients' affairs to be theirs to command, and that it had been his invariable practice to deliver such papers to the client whenever requested. When Beason asked Berke to request the return of the papers, Berke simply reported the fact to Cohen, saying, "Mr. Beason has asked me to ask you to return the files that you took from our office." [18] This would appear to have been no more than a transmittal by Berke to Cohen of Beason's request; at least it was scarcely a clear demand by Berke that Cohen submit to Berke's superior right. Berke subsequently wrote to Beason, "We have no interest in or right to possession of the records which we furnished Mr. Cohen and therefore have no right or obligation to ask him to return them to us." [19]

It is conceded that Cohen acquired the documents from Berke with Berke's full consent. On this record it cannot be said that Cohen's rightful possession was terminated by the subsequent assertion of an owner's superior right, assuming that right lay with Berke.

## II

The government's second contention is that Cohen should be denied the privilege against self-incrimination as to the accountant's work papers because these documents were prepared by the accountant for the latter's own use and therefore "did not constitute the personal private papers of the privilege-claimant" to which alone the privilege should apply. The "normal character and nature of an accountant's work papers as third-party documents, vis-a-vis the client" was not changed, the government's contention continues, by the "eleventh hour" transfer of these documents to Cohen.

If documents are incriminating, compelled production by the possessor would seem prohibited by the Fifth Amendment for reasons already discussed, without regard to any other characteristic the documents may possess.

■ It is true, as the government points out, that Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906), and cases which follow it, including United States v. White, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944), establish an exception applicable to the records of a corporation or other impersonal organization. It is also settled that the production of such records may be compelled

but B. Certainly, I can find nothing in the books which suggests such a distinction, and it contradicts the whole history of the matter. For the privilege runs along side by side with the power to compel production, and that power depends only upon serving the actual possessor. There are cases to be sure where one having custody is not required to produce, but it is only because his custody is so subordinate as not to justify his meddling with documents even to bring them to court. Certainly, a full possessor of the documents is always subject to subpoena, whether his possession is lawful or unlawful, and regardless of ownership.

See also Cohen, Federal Tax Investigations, 21 Tax L.Rev. 183, 199 n. 52 (1966).

18. The district court found that Berke took this step "only because of Beason's request. Berke did not make the request because he wanted the records back. The contrary is true. At all times, Berke disclaimed any property or possessory right to the records." 250 F.Supp. at 473.

19. 250 F.Supp. at 473 n. 1, quoting a letter from Berke to Beason dated September 29, 1964. This is the date upon which the summons was served upon Cohen. However, the concluding paragraph of the letter, not quoted by the district court, indicates that the letter was confirmatory of a telephone conversation between Berke and Beason on September 2, 1964.

even though a natural individual claiming privilege has acquired both possession and title. Grant v. United States, 227 U.S. 74, 75, 33 S.Ct. 190, 57 L.Ed. 423 (1913); Wheeler v. United States, 226 U.S. 478, 33 S.Ct. 158, 57 L.Ed. 309 (1912).

The latter rule is explained by the rationale of the exception itself. As we have noted, the public interest in effective governmental regulation of impersonal organizations underlies the exception. This interest does not end with the transfer of possession or ownership of an organization's records to a natural person. A claim of privilege by a transferee cannot be permitted to bar government inspection of such records any more than could a claim of personal privilege by an officer-custodian. There is no similar public policy requiring government access to the work papers of an individual accountant which would require barring a claim of privilege by another individual to whom such papers have been transferred.

The government argues that the purpose of the privilege is to prevent the prosecutor from invading the claimant's "privacies of life" (Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886)), and to force the government "to search for independent evidence" of the claimant's guilt (United States v. White, supra, 322 U.S. at 698, 64 S.Ct. 1248). Papers which originated with the accountant and were created by him for his own purposes are not embraced (the argument continues) within the "privacies" of Cohen's life, but on the contrary, constitute an independent source of evidence of Cohen's offense. The government urges that Cohen should not be permitted to extend the area covered by the privilege or to deny the government access to independent evidence by gathering the documents into his possession after being advised of the government's interest.

Although the summons issued in this case was sufficiently broad to include books and records which Cohen had delivered to the accountant for his use in the preparation of Cohen's tax returns, the government concedes that the privilege was not lost as to these books and records simply because Cohen reclaimed them so shortly before the summons was served. Thus the government's argument rests ultimately upon the contention that the documents were not sufficiently personal or private in character, rather than upon the contention that the time and manner of Cohen's acquisition of them undermined his claim of privilege.

Statements in United States v. White, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944), that the privilege applies to "personal" or "private" records do not support the government's position. As this court pointed out in United States v. Judson, 322 F.2d 460, 464 (1963), the Supreme Court intended only to distinguish between records of a natural person which are entitled to Fifth Amendment protection in appropriate circumstances and records of an impersonal organization which are never entitled to such protection. Since the latter are open to inspection by the government at its pleasure, so far as the privilege against self-incrimination is concerned, they may properly be characterized as quasi-public in character. There is nothing in *White* or earlier cases to suggest that the Court intended to base Fifth Amendment consequences upon the degree of privacy which attended the creation or maintenance of particular records or upon the degree of the intimacy of the information *which they contain.*

■ But even if we were to accept the government's test, the claim of privilege would not be barred here. Though prepared by Berke for use by him in the performance of his work, the work papers were scarcely public documents. They embody countless items of information relating to Cohen's purely personal affairs, including itemizations and summaries of data prepared directly from Cohen's bank statements, cancelled checks, and similar records. They were plainly intended for no eyes but those Cohen might designate. To pretend that such papers did not in substance reflect

matter personal and private to Cohen, and to treat such papers as a source of information "independent" of Cohen, would be to condone the very "shifts and subterfuges" which the government calls upon us to condemn.

We hold that as a general rule the Fifth Amendment privilege against self-incrimination permits a person in possession of potentially incriminating papers to decline to produce them in response to a summons; that the exception established by the Supreme Court's decisions in *Wilson* and *White* is limited to the records of impersonal organizations; and that if any other exceptions exist, based either upon the character of the papers or the nature of the claimant's possession, there is none which would bar assertion of the privilege by a claimant who is in possession, with the consent of an accountant, of work papers created by the accountant from information supplied by the person claiming the privilege.

Affirmed.