UNITED STATES of America,
Plaintiff,

v.

James William DeMARSH,
Defendant.

No. 71–CR–34.

United States District Court,
E. D. Wisconsin.

July 11, 1973.

the package and saw the 19 clay pipes which had been declared with customs. He also saw two sealed clear plastic wrappings and one opened multicolored plastic wrapping, both containing what appeared to be hashish. He dusted the multicolored package with fluorescent powder, initialed the carton, sealed the package, and returned it to the postal inspector.

Two days later, at about 1:15 P.M., the agents saw the package delivered to the defendant in person at Rangus House. The agents then left to obtain a search warrant and returned to the premises with the warrant about thirty-five minutes later. Finding no one there, they entered forcibly. Though they did not find a package, they did find and seize a note on the table which stated "Scored, Come Home," a letter addressed to one David Pressley, 2449 North Farwell Avenue, Milwaukee, and a letter addressed to one John Sheeley, 2106 North Oakland Avenue, Milwaukee. Agent Burton left a copy of the search warrant at the premises and went to investigate the addresses on the letters.

About one hour later, at 3:45 P.M., Agent Scoufis in the company of Detectives Ralph Jurasinski and Tom McHale of the Milwaukee Police Department knocked on the door at 2447–2449 North Farwell (hereafter the "Farwell residence"), the address indicated on the letter to David Pressley. Defendant happened to be in the upstairs flat at the time, however, and one of his friends saw the agents coming. Defendant had been weighing the hashish in the package from Germany. He gave it to the friend and told her to flush it down the toilet if he came back upstairs with anyone else. He then descended the stairs and answered the door. Agent Scofis showed defendant his badge, told him he was a federal agent, and asked to see defendant's friends. Defendant stated that his friends were in the upstairs flat, called to one of them, and receiving no response, led the officers up the stairs to the second floor of the apartment. Other details of the

David J. Cannon, U. S. Atty. by David B. Bukey, Asst. U. S. Atty., Milwaukee, Wis., for plaintiff.

Sara Joan Bales, Milwaukee, Wis., for defendant.

### DECISION AND ORDER

REYNOLDS, Chief Judge.

The defendant James William DeMarsh is charged with receiving and concealing approximately 1.75 pounds of imported hashish in violation of 21 U.S.C. § 176a. He now moves to suppress virtually all the evidence seized by law enforcement officers during the period surrounding his arrest. I conclude that most of the evidence is admissible.

The parties have stipulated to the following facts: On January 29, 1971, Theodore Scoufis and Thomas Burton, special agents of the Customs Agency Service, saw a large package at the United States Post Office in Milwaukee addressed to an import clothing store at 739 North 16th Street, Apartment 2, Milwaukee (hereafter "Rangus House"), with a return address from John Taylor, Box 43, Schiller College, Heidelberg, West Germany. Agent Scoufis opened

colloquy between the officers and the defendant are in dispute and will be discussed more fully below.

When Scoufis saw the package from Germany which he had seen at the post office on the kitchen table, he immediately arrested defendant and advised him of his constitutional rights. He then called the United States Attorney to ask whether he should obtain a search warrant before looking into the package. He was told a search warranty should be obtained.

Shortly after defendant's arrest, Agent Scoufis conducted an ultraviolet light test on defendant's hands. Defendant's hands gave off a glow when placed under the ultraviolet light. At this time Agent Scoufis removed a yellow, blue, and red covered plastic piece of wrapping material from the package from Germany. The plastic wrapping material also gave off a glow when placed under the ultraviolet light. Ultraviolet light tests were also performed on the other persons present in the flat. Shortly thereafter defendant asked to go to the bathroom. Agent Burton, who had since arrived at the flat, accompanied him to the bathroom where he saw and seized hashish in the toilet.

At 5:20 P.M. defendant was taken to a United States Magistrate. At that time Agent Burton also obtained a search warrant dated February 1, 1971, for the "entire upper level of the building known as 2447–2449 North Farwell, a wood frame, wood-sided, multi-level house on the West side of the street." Agent Burton's affidavit for the search warrant indicated that he had personally observed a quantity of hashish located at that address.

Federal agents then returned to the Farwell residence and searched it thoroughly. At that time the following items were seized: about 225 grams of hashish, about 1 gram of hashish, about 15 clay pipes, about 1 gram of an unknown substance, 1 opened international mail parcel, 1 metal holder, 1 glass pipe, 1 metal pipe, 1 calendar, 1 cigarette rolling machine, cigarette paper with filters, 1 scale, 1 strainer, 1 envelope addressed to defendant, 5 letters, 1 bank book, and papers.

I.

Defendant first contends that the seizures of certain items pursuant to the search warrants violated the rule against seizure of "mere evidence," and that all seizures of letters also violated the Fifth Amendment privilege against self-incrimination. Since the "mere evidence" rule was expressly abolished by the Supreme Court in Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), the seizures are not invalid on this ground.

■ The strength of defendant's Fifth Amendment argument varies between the particular letters seized. Two letters, one taken at each address, were sent from Robin Driscoll to David Pressley. Two other letters at the Farwell residence were addressed to the defendant but written presumably by Robin Driscoll. It must be assumed for purposes of this motion that defendant wrote the letters signed "James" and the note "Scored, Come Home."[1]

1. Despite historical support for limiting the Fifth Amendment privilege to verbal testimonial disclosures, the law is clear that the privilege now applies to personal records. Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886). But see Miranda v. Arizona, 384 U.S. 436, 460, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); 8 Wigmore, Evidence § 2263 (McNaughton rev. 1961). What records are considered "personal" has been most often delineated in tax cases when the taxpayer's books are sought by the Government. Contrary to the Government's assertions, the privilege has not been limited to records prepared by the claimant himself, but has often included records prepared by his accountant. Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771 (1911); United States v. Cohen, 388 F.2d 464 (9th Cir. 1967); Application of House, 144 F.Supp. 95 (N.D.Cal.1956).

■ Assuming the letters and the note were communicative in nature, the Government must distinguish Hill v. Philpott, 445 F.2d 144 (7th Cir. 1971), in which the Seventh Circuit Court of Appeals held that admission of doctor's records seized from his office and home would violate the privilege against self-incrimination. The Government attempts to distinguish Hill because certain letters were not written by defendant himself and because even those that were written by defendant were not kept sufficiently "private."[2]

As to those letters written by defendant himself, *Hill* controls. In that case, as here, the records were to be read by others, were known to others, and were apparently accessible to others. There is no basis for concluding that the letters here were less "private."

■ As to the letters not written by defendant, however, *Hill* does not control. Underlying the majority opinion in *Hill* was the belief that in the "realities of trial" reading from records written by the doctor himself would be the same as forcing the doctor to incriminate himself verbally:

> "Dean Wigmore's suggestion that there is no compulsion to testify because proof of authenticity must come from others without the help of the accused sounds well as an abstract proposition, but certainly ignores the realities of trial. The jury knows the

books and records belong to the defendant and the entries he has made therein speak against him as clearly as his own voice. * * *" Hill v. Philpott, 445 F.2d at 149.

Letters written by someone other than the defendant, however, lack the probative value of the defendant's own statements. Where admitting personal records made by the accused himself would not even allow citizens to keep their diaries private, admitting letters from others does not so invade a citizen's sphere of privacy. A further difference affecting the "realities of trial" is that an accused, in order to explain or impeach personal records which he has written, must take the stand himself and suffer the strategic disadvantages which accompany that action. But to explain or impeach records written by others, only the authors need be called. Accordingly, only those letters written by defendant himself must be suppressed.

## II.

Defendant next attacks the warrantless search of the second-story flat at the Farwell residence which led to his arrest. Specifically, defendant claims that since the search was invalid, the fruits of the search, such as the package from Germany, was tainted and that probable cause for defendant's arrest would not have existed without this evidence. Since the arrest was invalid, all

---

2. I do not read *Hill* to say that the scope of the Fifth Amendment privilege is always the same whether the materials are seized by law enforcement officers or whether a summons for the materials is issued. If this is the necessary reading of *Hill*, however, then all the items here must be suppressed, for the Government could not compel production of any of them through a summons. That defendant did not personally write all the letters does not exclude them from the privilege when a summons is employed. United States v. Cohen, 388 F.2d 464 (9th Cir. 1967). That defendant did not officially "own" or "lease" the premises where the letters were found is unimportant. The Farwell building was a residence. Defendant lived there, and in living there used the area where the letters were seized. The letters were to be read only by persons of defendant's choosing, not by the public and not by the Government. The letters and the note were no less "private" because defendant did not have a safe in a study in a private home to keep them in.

Rangus House was an important clothing store. It was not open when the letters were seized. Defendant worked there and apparently had just locked the door upon leaving. He expected the letters and the note to be seen only by those with a key to the store, and his expectation of privacy was reasonable. The present record does not enable me to find that the letters were not in his possession.

searches incident to that arrest were likewise invalid. The Government replies that defendant consented to the agents' entry of the flat, and that being lawfully there, the agents saw the package in plain view.

The sole issue appears to be whether defendant consented to the agents' entry of the Farwell residence. Defendant admits that once the agents entered the residence, he assisted them in contacting the other residents in the second-story flat. First he called one of the residents to come down. Receiving no response, he led the agents upstairs into the flat. Although the parties dispute whether defendant led the way into the kitchen area where the package from Germany was visible, the record shows that no closed doors separated the agents from the kitchen and that the agents came upon the package merely by looking around the flat and making the observations normally expected of any casual visitor. Unless the agents were required to stay immediately behind defendant in lock step fashion so that they would see what he could see and nothing more, their inadvertent sighting of the package appears to fall within the plain view exception. Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L. Ed.2d 564 (1971).

Consequently, the encounter between the agents and the defendant at the door of the downstairs flat becomes crucial. It is clear that Agent Scoufis knocked on the door, announced he was a federal agent, and displayed his badge. At that point, defendant claims, the three agents said "open the door," pushed the door open, and walked in. Defendant had earlier testified differently, saying that he opened the door in response to the agents' command. In any event, defend-

ant claims, the agents did not request entry and were never invited into the building. Defendant testified that once the agents were in the building, they asked him a series of questions, and in reply he told them that he lived there, that no one else was in the downstairs flat, but that there were residents in the upstairs flat. Defendant later admitted that he had actually told the agents he did not live there. He then claims he retracted this statement and told the agents he did live there. He did not actually remember telling the agents he was visiting friends, but he did testify that the agents asked him to call the people upstairs and that he then called one of them by her first name.

The agents' version differs in that they claim defendant opened the door initially to talk to them. While still outside the door, they asked defendant, among other things, if he lived there; he said no, he was visiting friends. They then asked to talk to the friends, and at that point defendant said "come in," called to one of his friends, and receiving no response, led the agents upstairs. Having heard the evidence, I find the facts to be substantially as the agents have testified.

The factual question remains whether defendant voluntarily consented to the agents' entry of the flat.[3] Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). The burden of proof is on the Government, and the standard for voluntariness in noncustody consent searches was recently established by the United States Supreme Court in Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (decided May 29, 1973). The majority in *Schneckloth* rejected the contentions, advanced by defendant here,

3. According to defendant, the agents, having obtained consent to enter the door of the ground floor flat, should have explicitly asked consent to ascend the stairs and then again have asked consent to enter the second-story flat. It is true that the scope of the search is limited by the scope of the consent. But once de-

fendant consented to the entry of the downstairs flat, I believe he satisfactorily expressed his consent to ascending the stairs and entering the second-story flat by indicating that the people the agents sought were upstairs and by leading the agents up the stairs and into the flat to contact them.

that the police must warn the resident of his right to insist upon a search warrant or that the resident must otherwise know he has a right to refuse the search. Instead the majority embraced a much less demanding standard for voluntariness and suggested the duality that should guide the fact finder:

> " * * * it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact [the consent] was voluntary or coerced. * * * " *Schneckloth* at 233, 93 S.Ct. at 2050.

■ Hence, in applying *Schneckloth*, it is important that there are no facts which suggest coercion, other than the mere presence of the three agents at defendant's door. On the contrary defendant's own actions, namely, his failure to object to the agents' entry, his statement "come in," and his assistance once the agents entered, suggest a willing and cooperative attitude. Defendant's prior knowledge that men like the agents would meet him at the door, his collegiate background, and his awareness of the right to remain silent and the right to counsel betray the image of a startled teenager who could not distinguish a request from a command. Moreover, it was reasonable for him to assist the agents in entering the flat

and talking to his friends. Although under his plan the hashish would be lost, he would be safe from arrest. He did not know that the package itself would reveal his guilt. To stand on his rights and refuse entry would have only aroused suspicion. Under the standard of *Schneckloth* I find defendant consented to the agents' entry.[4]

■ After defendant was arrested, the agents placed his hands under a fluorescent light. Such an examination of one under arrest does not constitute a search subject to Fourth Amendment constraints. Schmerber v. State of California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); United States v. Richardson, 388 F.2d 842, 845 (6th Cir. 1963); United States v. Millen, 338 F. Supp. 747 (E.D.Wis.1972). The agents also tested the hands of the other residents in the apartment. Those residents were not charged, however, and the Government's failure to comment on this evidence suggests that the evidence may not be offered. Hence, its admissibility need not be determined at this time.

■ Defendant's other contentions, namely, that the magistrate lacked probable cause to issue the search warrants and that the warrants were too broad in scope, are without merit.

---

4. The record reveals that at the time the agents saw the package from Germany, they heard the toilet flushing in the bathroom. Immediately the agents ordered the occupant out of the bathroom. Later when defendant asked to use the bathroom, they went with him and found hashish in the toilet.

Under the circumstances the search of the bathroom was a valid search incident to defendant's arrest. It is clear that the agents would have been justified in searching the bathroom immediately after the toilet was flushed, for by acting at once they might have prevented the loss of hashish into the sewer system. Arguably the danger that traces of hashish which were not flushed down at once would be lost with the passage of time created a sufficient exigency to justify the later search.

There is another basis for upholding this warrantless search, however. For it

seems that defendant's need to go to the bathroom created as great an exigency for the law enforcement officials as it did for defendant himself. Allowing defendant to go to the bathroom, even if another bathroom were available, would at the very least have given him an opportunity to destroy any evidence on his person. Yet forcing law enforcement officials to deny such requests until a warrant can be obtained is neither reasonable nor consistent with the Fourth Amendment's attempt to preserve the dignity of all persons. Hence, I believe law enforcement officials may grant such requests and then conduct whatever searches are necessary to protect themselves or others or to prevent the destruction of evidence. Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

It is therefore ordered that defendant's motion to suppress the letters and the note which he wrote himself is granted.

It is further ordered that defendant's motions to suppress other evidence are denied.