500 F.2d 683
 74-2 USTC P 9512
 UNITED STATES of America and Alan M. Feldman, Special Agent,
Internal Revenue Service, Appellant,
v.
Solomon FISHER, Appellant, Morris Goldsmith and Sally
Goldsmith, Intervening Party Defendants.
 No. 72-2001.
 United States Court of Appeals, Third Circuit.
 Argued May 25, 1973.
Reargued en banc April 10, 1974.
Decided June 7, 1974.
 
 Solomon Fisher, Richard L. Bazelon, Dilworth, Paxson, Kalish, Levy & Coleman, Philadelphia, Pa., for appellants.
 Scott P. Crampton, Asst. Atty. Gen., Gary R. Allen, Meyer Rothwacks, Tax Div., Dept. of Justice, Washington, D.C., Robert E.J. Curran, U.S.Atty., Philadelphia, Pa., for appellees.
 Argued May 25, 1973
 Before ALDISERT and HUNTER, Circuit Judges, and STAPLETON, District judge.
 Reargued April 10, 1974
 Before SEITZ, Chief Judge, and VAN DUSEN, ALDISERT, GIBBONS, ROSENN, HUNTER, WEIS and GARTH, Circuit Judges.OPINION OF THE COURT
 ALDISERT, Circuit Judge.
 
 
 1
 Couch v. United States, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973), held that where a taxpayer had effectively surrendered possession of her business records to her accountant and the accountant was served with an Internal Revenue Service summons, the taxpayer could not successfully assert the Fifth Amendment privilege against compelled incrimination. The question presented by this taxpayers' appeal from a district court order enforcing a summons issued pursuant to 26 U.S.C. 7602 if a spin off of the Couch issue: where work papers owned by the accountant and prepared by him for tax purposes at the taxpayers' request are transferred from the accountant to the taxpayers and thence by them to their attorney, are the papers immunized from a summons directed against the attorney?
 
 
 2
 Most of the narrative or historical facts are not in dispute. In the summer of 1971, Feldman was employed as a Special Agent of the Intelligence Division of the Internal Revenue Service and was assigned to investigate the tax liability of the Goldsmiths for years 1969 and 1970. No employee of the Audit Division of the Service was then participating in the investigation. In late July of that year, Feldman spoke with Mr. Goldsmith and made an appointment with him to discuss Mr. Goldsmith's tax liability. On August 3, 1971, Morris and Sally Goldsmith retained Fisher to represent them, and Fisher called Feldman to advise him that Mr. Goldsmith would not appear for the appointment.
 
 
 3
 In early August of 1971,[1] the Goldsmiths obtained from their accountant, Harold Berson, certain records which constituted 'the balance' of records concerning the Goldsmiths which Berson then had in his possession. Some dated as far back as 1959. On August 17, 1971, the Goldsmiths turned these records over to Fisher. A stipulation of the parties, as articulated by Fisher, was as follows:
 
 
 4
 On August 17, 1971 Morris Goldsmith and Sally Goldsmith turned over to me certain records which I now have in my possession. Such records were turned over to me for my use in representing them, furnishing them with legal advice, and from the time those records were turned over to me to the present time I have been using them for that purpose.
 
 
 5
 These records included the 'analyses' which the government seeks to inspect. These 'analyses,' designated 'analysis of receipts and disbursements,' are essentially lists of income and expenses compiled by Berson from cancelled checks and deposit receipts supplied by the Goldsmiths, but do not include the checks and deposit receipts themselves.
 
 
 6
 On October 22, 1971, Feldman served a summons on Berson seeking documents which related to the tax liability of Morris Goldsmith. Berson told Feldman at the time of service that he had no documents of this character and that all documents which he had previously possessed had been turned over to Mr. Goldsmith. Feldman nevertheless put a return date of November 3rd on the summons because Berson indicated he would try to get the papers back.[2] Berson testified that he 'contacted Mr. Goldsmith and told him that . . . (he, Berson,) would like to get the papers back, that . . . (he) was requested by the Government to bring them to their offices.' Berson appeared on November 3rd to report that he did not have the documents sought.
 
 
 7
 On December 1, 1971, the summons which the government now seeks to enforce was served upon Fisher, directing him to appear 'to give testimony relating to the tax liability or the collection of the tax liability' of Morris Goldsmith and to bring with him, among other things, an 'Analysis of Receipts and Disbursements for Morris Goldsmith for 1969 and 1970' and an 'Analysis of the Receipts and Disbursements of Sally Goldsmith for 1969 and 1970.' Fisher appeared with the records in response to the summons, but refused to permit their inspection. This enforcement action was then commenced. The Goldsmiths were permitted to intervene and, together with Fisher, defended on the grounds (1) that the summons was invalid and (2) that production would violate the Goldsmiths' rights under the Fifth Amendment to the United States Constitution.
 
 
 8
 After a hearing, the district court found as a fact that 'no recommendation for criminal prosecution . . . (had) been instituted by the I.R.S.' during the relevant period and that the summons was issued in good faith. It also found that 'the purpose of the summons is merely to examine the possible tax liability of the Goldsmiths.' Considering Donaldson v. United States, 400 U.S. 517, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971), as controlling, the court held that the summons was issued for a valid purpose. The court further found that the records sought were owned by Berson, rejected the constitutional argument and ordered production.[3]
 
 
 9
 Appellants here renew their dual attack on the summons. We address both contentions.
 
 I.
 
 10
 Appellants contend that the summons served upon Mr. Fisher, pursuant to 26 U.S.C. 7602,[4] is unenforceable because its sole object is to obtain evidence to use in a criminal prosecution. Reisman v. Caplin, 375 U.S. 440, 449, 84 S.Ct. 508, 11 L.Ed.2d 459 (1964). In support of this proposition, appellants emphasize that Special Agent Feldman was the sole government representative engaged in the investigation of the Goldsmiths' tax liability and that an official statement of the Internal Revenue Service describes the function of the Intelligence Division as an arm of the Service which investigates and enforces criminal violations of various tax laws of the United States.[5] On this showing alone the appellants would have us reverse the district court's holding that the summons was issued for a valid purpose. This we decline to do.
 
 
 11
 It is now well settled that the possibility that criminal prosecution as well as civil liabilities may arise from a tax investigation is not a sufficient ground for refusing to enforce a summons issued under Section 7602 in good faith and prior to a recommendation for prosecution. Donaldson v. United States, supra. In Donaldson the Supreme Court, in rejecting a contention similar to that here made, said:
 
 
 12
 Congress clearly has authorized the use of the summons in investigating what may prove to be criminal conduct. * * * There is no statutory suggestion for any meaningful line of distinction, for civil as compared with criminal purposes, at the point of the special agent's appearance. * * * To draw a line where a special agent appears would require the Service, in a situation of suspected but undetermined fraud, to forego either the use of the summons or the potentiality of an ultimate recommendation for prosecution. We refuse to draw that line and thus to stultify enforcement of federal law. * * *
 
 
 13
 We hold that under 7602 an internal revenue summons may be issued in aid of an investigation if it is issued in good faith and prior to a recommendation for criminal prosecution.[6]
 
 
 14
 It is also well established that the burden of showing an improper purpose is on the taxpayer. Donaldson v. United States, supra, 400 U.S. at 527; United States v. Powell, 379 U.S. 48, 58, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964); United States v. Erdner, 422 F.2d 835 (3d Cir. 1970); United States v. De Grosa, 405 F.2d 926 (3d Cir.), cert. denied sub nom., Zudick v. United States, 394 U.S. 973, 89 S.Ct. 1465, 22 L.Ed.2d 753 (1969). The district court found as a fact that 'no recommendation for criminal prosecution has been instituted by the I.R.S.' Nor did it find that the summons was issued in other than good faith. Moreover, the court affirmatively found that 'the purpose of the summons . . . (was) merely to examine the possible tax liability of the Goldsmiths.' These findings are not clearly erroneous. Krasnov v. Dinan, 465 F.2d 1298, 1302-1303 (3d Cir. 1972).[7]
 
 
 15
 Thus, taxpayers would have us hold that their burden is met by a mere showing that a Special Agent of the Service's Intelligence Division was the only person assigned to investigate their tax liability. If we were to accept taxpayers' argument we would be drawing a line where a special agent appears, a line which the Court in Donaldson expressly refused to draw. Both in De Grosa and Erdner we refused to hold that such evidence, in itself, satisfied the taxpayer's burden of proof. We reaffirm those holdings today.
 
 II.
 
 16
 Thornier issues are raised by taxpayers' claim that production of the 'analyses' in the possession of Fisher would violate their rights against self-incrimination. This contention is based, in part, upon the assertion that the only permissible inference to be drawn from the record below is that the Goldsmiths owned the records sought. The finding of the district court that the analyses were the property of the accountant is not clearly erroneous, Krasnov v. Dinan, supra.[8] We accordingly accept that finding.
 
 
 17
 If ownership vel non were the test of the scope of the Fifth Amendment privilege, our analysis would be at an end. But such is not the test, for the Fifth Amendment privilege focuses on personal compulsion upon the person asserting it. Possession, not ownership, 'bears the closest relationship to the personal compulsion forbidden by the Fifth Amendment.' Couch v. United States, supra, 409 U.S. at 331. Thus we are led to Goldsmiths' argument that, even if Berson is held to own the 'analyses,' Goldsmiths' transitory possession of the records and their subsequent possession by Fisher established that requisite degree of privacy so that it can be said that enforcement of the summons issued to Fisher amounted to that type of personal compulsion against the Goldsmiths which is prohibited by the Fifth Amendment. To be successful with this argument appellants must convince us of the validity of two propositions: First, if the Goldsmiths had not given the 'analyses' to Fisher, they could have successfully resisted the summons because the documents sought would have been in a rightful personally privileged possession, and, second, the Goldsmiths should not be held to have lost their privilege solely because they surrendered actual possession to Fisher for the purpose of obtaining legal advice in connection with the investigation. The government disputes these propositions, arguing that the analyses would not have been within the scope of the privilege in the hands of the Goldsmiths and that, in any event, the Goldsmiths are barred from asserting the privilege because, in fact, they had neither ownership nor possession at the time of the service of the summons.
 
 A.
 
 18
 The facts in this case must be compared with those in Couch. Here, ownership was found to be in the accountant; there, ownership was in the taxpayer. Here, possession was in the lawyer, the subject of the summons; there, possession was in the accountant, also the subject of the summons. Here, the taxpayers, as in Couch, had to be aware that at least summaries of the information furnished the accountant from which he fashioned his records had to be disclosed in certain tax returns. But that which distinguishes this case from Couch is the additional question of the reasonable likelihood of privacy and freedom from compulsion expected by the taxpayers at the time they delivered the accountant's records to their lawyer.
 
 
 19
 In Couch, as previously noted, the Supreme Court rejected the thesis that the Fifth Amendment privilege was equated with ownership. The Court said: 'The criterion for Fifth Amendment immunity remains not ownership of property, but the 'physical or moral compulsion exerted.' * * * We hold today that no Fourth or Fifth Amendment claim can prevail where, as in this case, there exists no legitimate expectation of privacy and no semblance of governmental compulsion against the person of the accused.' 409 U.S. at 336. It emphasized that 'actual possession of documents bears the most significant relationship to Fifth Amendment protections . . .' 409 U.S. at 333, acknowledged the possibility of constructive possession in certain cases and refrained from deciding 'what qualifies as rightful possession enabling the possessor to assert the privilege.' 409 U.S. at 330 n. 12.
 
 
 20
 Because concepts of 'ownership' and 'possession' and 'expectations of privacy' dominate the text of the cases, it becomes important to remind ourselves that these are organons of the decisional process only. Although effective as jurisprudential tools, these concepts are not, in and of themselves, controlling. This 'is a constitution we are expounding.'[9] We must never wander from the principle that what the Fifth Amendment prohibits is compelled incrimination.
 
 
 21
 Supporting the notion that there may not be compelled production of 'a man's private books and papers' is the 1886 case of Boyd v. United States, 116 U.S. 616, 633, 6 S.Ct. 524, 534, 29 L.Ed. 746, whose vital signs are still given formal recognition, Bellis v. United States, 417 U.S. 85, 94 S.Ct. 2179, 40 L.Ed.2d 678 (1974), Couch v. United States, supra, 409 U.S. at 330, but whose vigor has been seriously sapped by subsequent analyses by the Supreme Court. The ratio decidendi of Boyd was premised on the notion that court-ordered production of a person's 'private papers' to be used as evidence to convict him of crime violated the Fourth as well as the Fifth Amendment. Fourth Amendment considerations do not detain us; such an argument has not been presented in this appeal.[10]
 
 
 22
 Boyd's Fifth Amendment premise was based on the twin concepts of ownership and possession. Although addressing property notions in the context of the Fourth Amendment, Warden v. Hayden, 387 U.S. 294, 304, 87 S.Ct. 1642, 1648, 18 L.Ed.2d 782 (1967), emphasized:
 
 
 23
 The premise that property interests control the right of the Government to search and seize has been discredited. Searches and seizures may be 'unreasonable' within the Fourth Amendment even though the Government asserts a superior property interest at common law. We have recognized that the principal object of the Fourth Amendment is the protection of privacy rather than property, and have increasingly discarded fictional and procedural barriers rested on property concepts. See Jones v. United States, 362 U.S. 257, 266, 80 S.Ct. 725, 4 L.Ed.2d 697; Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734. This shift in emphasis from property to privacy has come about through a subtle interplay of substantive and procedural reform.
 
 
 24
 We detect the same 'shift in emphasis from property to privacy' in the Court's treatment of the Fifth Amendment in compelled production of documents. 'The criterion for Fifth Amendment immunity remains not the ownership of property . . .', Couch v. United States, supra, 409 U.S. at 336;[11] 'the papers and effects which the privilege protects must be the private property of the person claiming the privilege, or at least in his possession in a purely personal capacity.' United States v. White, supra, 322 U.S. at 699.
 
 
 25
 Bellis v. United States, supra, 417 U.S. 85 at 91, 94 S.Ct. 2179, at 2184, 40 L.Ed.2d 678, reaffirms this shift in emphasis:
 
 
 26
 The Court's decisions holding the privilege inapplicable to the records of a collective entity also reflect a second, though obviously interrelated policy underlying the privilege, the protection of an individual's right to a 'private enclave where he may lead a private life.' Murphy v. Waterfront Comm'n, 378 U.S. 52, 55, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964). We have recognized that the Fifth Amendment 'respects a private inner sanctum of individual feeling and thought'-- and inner sanctum which necessarily includes an individual's papers and effects to the extent that the privilege bars their compulsory production and authentication-- and 'proscribes state intrusion to extract self-condemnation.' Couch v. United States, supra, at 327. See also Griswold v. Connecticut, 381 U.S. 479, 484, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965). Protection of individual privacy was the major theme running through the Court's decision in Boyd . . ..
 
 
 27
 United States v. Egenberg, 443 F.2d 512 (3d Cir. 1971), emphasizes these basic principles.
 
 
 28
 Couch does not undercut Egenberg. Couch simply articulates that ownership of papers per se does not carry with it a vesting of the privilege against self-incrimination, that actual possession of documents bears the most significant relationship to Fifth Amendment protections against state compulsions upon the individual accused of crime, and that there may be examples where constructive possession is so clear or relinquishment of possession is so temporary and insignificant as to leave the personal compulsions upon the accused substantially intact.
 
 
 29
 The case sub judice presents a factual array of ownership of the records in the accountant, a shift in their possession from the accountant to the taxpayers at the taxpayers' request upon advice of Fisher only a day or two after Fisher began his representation and broke Morris Goldsmith's appointment with agent Feldman, a 'temporary and insignificant' history of actual possession in the taxpayers and actual possession in a third party at the time of the issuance of the summons. We fail to see how this factual complex gives rise to that element of personal compulsion upon the taxpayers which is the hallmark of the right against compulsory self-incrimination. Thus, we have no difficulty in concluding that, unless the attorney-client relationship intervenes, this case is squarely controlled by Couch.
 
 
 30
 In this appeal the taxpayers do not rely on the attorney-client privilege qua privilege. Thus, the attorney-client relationship is relevant to our Fifth Amendment inquiry only as an indicia of the degree of privacy or freedom from compulsion to be expected by the taxpayers when they transferred the records to their attorney. Stated otherwise, the relationship is relevant only to a determination of whether these records, owned by the accountant, have the capacity of coming within the penumbra of the Boyd rule.
 
 
 31
 Papers otherwise not endowed with Fifth Amendment protection cannot be transmuted into a privileged status merely because of the act of delivery to a lawyer. People have constitutional rights, papers do not. Thus, the claim to the Fifth Amendment privilege must emanate from the taxpayers' rights. And in the attorney-client relationship, the rights must flow upward from the taxpayer; not downward from the attorney.
 
 Judge Friendly has reminded us:
 
 32
 Certain basic principles, however, are well-established. The privilege finds its justification in the need to allow a client to place in his lawyer the 'unrestricted and unbounded confidence', United States v. Kovel, supra, 296 F.2d 918 at 921 (2d Cir. 1961), that is viewed as essential to the protection of his legal rights. But the privilege stands in derogation of the public's 'right to every man's evidence', 8 Wigmore, supra, 2192, at 70, and as 'an obstacle to the investigation of the truth,' id., 2291, at 554; thus, as Wigmore has said, 'It ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle.' Id. It must be emphasized that it is vital to a claim of privilege that the communications between client and attorney were made in confidence and have been maintained in confidence.
 
 
 33
 In re Horowitz, supra, 482 F.2d 72, at 81-82.
 
 
 34
 ( 6) Here, the analyses of cash receipts and disbursements were prepared by the accountant, not the taxpayers. They were prepared by him for the purpose of forwarding to appropriate tax authorities a declaration of the taxpayers' taxable status.[12] The analyses were not prepared by the client-taxpayers or by the accountant for some personal, private, and confidential purpose for disclosure to the taxpayers' lawyer only. The taxpayers enjoyed no history of extended actual possession of the analyses. Their actual possession was fleeting and transitory, limited to the act of delivery from the accountant's office to the office of their lawyer at his request. Thus, if the taxpayers are to succeed in their effort, they must prove that their brief experience of actual possession for a limited purpose coupled with turning their accountant's records over to their attorney has the legal capacity to generate a subsequent right of constructive possession of sufficient intensity to elevate those records into the required category of their 'private books and papers.' We are unwilling to attribute a Fifth Amendment protection to the accountant's work product based on such a limited possession by his client.
 
 
 35
 The judgment of the district court will be affirmed.
 
 GIBBONS, Circuit Judge (concurring):
 
 36
 I join in Judge Aldisert's opinion, but add a caveat with respect to some inferences which might be drawn from it for other situations. As Professor McNaughton in his revision of 8 Wigmore on Evidence 2263 (1961) explains there are three possible forms of disclosure to which the privilege against self-incrimination might arguably apply:
 
 
 37
 (1) self-incriminating disclosures that are testimonial (i. e., communicative or assertive) in nature;
 
 
 38
 (2) self-incriminating disclosures which, though not testimonial in the communicative or assertive sense, involve cooperative participation by a witness; or
 
 
 39
 (3) any evidence whatsoever obtained from a witness which might incriminate him, whether or not his cooperative participation is involved.
 
 
 40
 In Boyd v. United States, 116 U.S 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886) the Court considered the application of the fourth and fifth amendments to a statute, similar to Rule 36 of the Federal Rules of Civil Procedure, authorizing the service of a notice by the government on a party in a civil suit to produce a book, invoice or paper in court, and providing that if the party failed to produce the allegations in the government's motion 'shall be taken as confessed, unless his failure or refusal to produce the same shall be explained to the satisfaction of the court.' Act of June 22, 1874, 5, 18 Stat. 187. The suit was for forfeiture of merchandise allegedly imported without proper payment of duties, and the paper in issue was an invoice for the merchandise. The invoice was a paper prepared by a party, and thus contained no communication or assertion by the party to whom the notice was addressed. It was however, owned and possessed by that party, its contents did tend to incriminate, and its production probably required cooperative participation. Justice Bradley's opinion of the Court, a mixture of fourth and fifth amendment reasoning, held that the statute violated both amendments. Justice Miller, concurring, analogized the notice to a subpoena duces tecum and urged that only the fifth and not the fourth amendment was violated. As the authorities cited in Judge Aldisert's footnote 10 make clear, Justice Miller's analysis rather than that of Justice Bradley, has better stood the test of time. But the fifth amendment holding in Boyd was unanimous.
 
 
 41
 It was clear in Boyd that no evidentiary use was to be made of the party's possession of the invoice. The only use was the evidentiary value of the contents of the invoice for the truth of the matter asserted-- value of the goods-- by a third party. Thus Boyd must be read as authority for at least McNaughton's second category. That is, Boyd interpreted the fifth amendment as prohibiting any self-incriminating disclosure involving cooperative participation. But so broad a holding has not survived. Perhaps the clearest rejection of the cooperative participation test is in Justice Brennan's opinion in Schmerber v. California, 384 U.S. 757, 761, 86 S.Ct. 1826, 1830, 16 L.Ed.2d 908 (1966), where the Court declared:
 
 
 42
 'We hold that the privilege (against self-incrimination) protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature,*
 
 
 43
 Thus what seems to be left is McNaughton's first category-- self-incriminating disclosures that are testimonial in a communicative or an assertive sense. Three separate possible forms of communication may be involved with a subpoena duces tecum. One is the communication involved in the identification or authentication of the document. A second is the communication involved in acknowledging the fact of possession. The third is the communication involved in the contents of the document. In this case, the government has not asked for and does not need testimony from Mr. Goldsmith in order to authenticate the papers. Even if they were in Goldsmith's possession his mere production of them would not authenticate them and the government could use another witness for that purpose. Goldsmith's production of the papers in response to a subpoena duces tecum would not require any testimony on his part. Shapiro v. United States, 335 U.S. 1, 27, 68 S.Ct. 1375, 92 L.Ed. 1787 (1957); Wilson v. United States, 221 U.S. 361, 372, 31 S.Ct. 538, 55 L.Ed. 771 (1911). I make this point because Judge Aldisert's opinion, by properly emphasizing Goldsmith's lack of possession in this case and confining its discussion to that factual complex, might be misunderstood as suggesting that had papers belonging to the accountant been in Goldsmith's possession they could not have been subpoenaed. Justice Bradley's opinion in Boyd v. United States, supra, would suggest that result, but the Boyd holding to that effect has long since been repudiated. The issue is not presented in this case. Wilson v. United States, supra and United States v. White, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944) make clear that the involuntary surrender of papers rightfully possessed, pursuant to a subpoena duces tecum, is not within the privilege. As the majority opinion makes clear, Couch v. United States, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973) rejects ownership of the papers as a test. Obviously ownership does not bear upon compelled communication. What remains, I suggest, is the test announced by Justice Brennan in Schmerber v. California, supra-- compulsion of evidence of a testimonial or communicative nature. It would seem, then, that for fifth amendment purposes a subpeona duces tecum should be enforced even for papers owned and possessed by the witness so long as (1) the fact of his possession was not of evidentiary significance or his production was not used for that evidentiary purpose, (2) their mere production did not require his testimony, and (3) they could be authenticated through some other witness. But see United States v. Austin-Bagley Corp., 31 F.2d 229 (2d Cir.), cert. denied, 279 U.S. 863, 49 S.Ct. 479, 73 L.Ed. 1002 (1929) holding that a custodian could be compelled to authenticate records which incriminated him. In the light of Schmerber and Couch I question whether Austin-Bagley is authoritative today. Neither the issue of mere production of papers owned by the witness nor the issue of testimonial authentication of papers in the witness's possession is decided by this case. Nor do we reach the issue of production of papers containing entries made by the witness and thus reflecting his communications made at a prior time.
 
 
 44
 JAMES HUNTER, III, Circuit Judge (concurring in part and dissenting in part):
 
 
 45
 In concur in Part I but dissent from Part II of the majority opinion. My concern is two-fold: 1) the majority misreads, in my view, the import of the Supreme Court's decision in Couch, and 2) I fail to understand the rationale by which the majority reaches its decision. The majority states:
 
 
 46
 'If ownership vel non were the test of the scope of the Fifth Amendment privilege, our analysis would be at an end. But such is not the test, for the Fifth Amendment privilege focuses on personal compulsion upon the person asserting it. Possession, not ownership, 'bears the closest relationship to the personal compulsion forbidden by the Fifth Amendment.' Couch v. United States, supra, 409 U.S. at 331.' Majority opinion at 689.
 
 
 47
 The majority also concedes that in certain situations a person may divest himself of actual possession, but yet retain constructive possession so as to leave the personal compulsions upon the accused substantially intact. Couch v. United States, 409 U.S. 333-335 (1973). Thus possession (either actual or constructive), not ownership, bears the most significant relationship to the fifth amendment protections.
 
 
 48
 The majority's recognition of these governing principles is unassailable and to this extent I am in complete agreement. I would add further, however, that Couch noted that 'it is extortion of information from the accused himself that offends our sense of justice.' 'As Mr. Justice Holmes put it: 'A party is privileged from producing the evidence, but not from its production." 409 U.S. at 328. The fifth amendment forbids 'inquistorial pressure or coercion against a potentially accused her will, to utter self-condemning words or produce incriminating documents.' 409 U.S. at 329. The incrimination comes from being forced 'to produce and authenticate any personal documents or effects that might incriminate' you. United States v. White, 322 U.S. 694, 698, 64 S.Ct. 1248, 1251, 88 L.Ed. 1542 (1944), cited with approval in Couch, supra, 409 U.S. at 330.
 
 
 49
 Couch therefore reaffirmed the previously accepted view of the Supreme Court that 'what is incriminating about the production of a document in response to an order is not its contents, as one might have thought, but the implicit authentication that the document is the one named in the order.' 409 U.S. at 348 (Marshall, J., dissenting).[1]
 
 
 50
 With these principles in mind, I turn to the following statement by the majority, with which I am in full agreement:
 
 
 51
 'To be successful with (their argument) appellants must convince us of the validity of two propositions: First, if the Goldsmiths had not given the 'analyses' to Fisher, they could have successfully resisted the summons because the documents sought would have been in a rightful personally privileged possession, and, second, the Goldsmiths should not be held to have lost their privilege solely because they surrendered actual possession to Fisher for the purpose of obtaining legal advice in connection with the investigation.'
 
 
 52
 I believe both questions should be answered in the affirmative.
 
 I.
 
 53
 The Goldsmiths could have successfully asserted the fifth amendment while the 'analyses' were in their actual possession.
 
 
 54
 In my view the majority obscures this issue by dismissing Goldsmiths' actual possession as 'fleeting and transitory, limited to the act of delivery from the accountant's office to the office of their lawyer at his request.' Besides being misleading,[2] this statement is irrelevant. Nowhere in Couch did the Supreme Court suggest that the personal compulsion prohibited by the fifth amendment is dissipated whenever actual possession has been brief. If a subpoena had been served on the Goldsmiths while they were in actual possession of the documents, I fail to understand how the personal compulsion, which is the essence of the fifth amendment prohibition, can vary depending on the length of time the documents had previously been in Goldsmiths' actual possession.
 
 
 55
 Couch suggested that what is significant is not length of possession, but the quality of possession, i.e., rightful possession in a purely personal capacity. The majority's concern that actual possession was allegedly 'fleeting and transitory' is misplaced. These and other similar adjectives were referred to in Couch solely with respect to the constructive possession issue, i.e., whether, inter alia, the divestment of actual possession (not the length of actual possession) is so 'fleeting' or so 'temporary and insignificant' that constructive possession is retained.
 
 
 56
 More relevant is the recognition by Couch that while Boyd did not 'address or contemplate the divergence of ownership and possession,' 409 U.S. at 330, the subsequent Supreme Court decision in United States v. White[3] did address this issue:
 
 
 57
 'The papers and effects which the privilege protects must be the private property of the person claiming the privilege, or at least in his possession in a purely personal capacity.' 409 U.S. at 330 n. 10.[4]
 
 
 58
 Thus, the Supreme Court in White clearly suggested that something short of 'private property' may be sufficient to invoke the fifth amendment. Couch not only approved this language in White, but also, as if to make its position unquestionably clear, cited with approval the Ninth Circuit decision in United States v. Cohen:
 
 
 59
 'See also United States v. Cohen, 388 F.2d 464, 468 (CA9 1967), where the court, in upholding the right of a possessor, non-owner, to assert the privilege, noted that 'it is possession of papers sought by the government, not ownership, which sets the stage for exercise of the governmental compulsion which it is the purpose of the privilege to prohibit.' Though the instant case concerns the scope of the privilege for an owner, nonpossessor, the Ninth Circuit's linkage of possession to the purposes served by the privilege was appropriate.
 
 
 60
 'We do not, of course, decide what qualifies as rightful possession enabling the possessor to assert the privilege.' 409 U.S. at 330 n. 12.
 
 
 61
 In Cohen, ownership and possession diverged just as in White. Only in Cohen, unlike white, there was possession in a 'purely personal capacity.'[5] The taxpayers' refusal to produce the records was upheld on fifth amendment grounds. Thus, except for the constructive possession issue, Cohen is virtually identical to the case before us.
 
 
 62
 In view of the Supreme Court's emphasis on possession as most relevant to the question of compulsion, I cannot believe that we should disregard Couch's discussion of White and Cohen. It is difficult for me to understand, in view of the many courts which have wrestled with this problem, why the Supreme Court would choose to single out this language in Cohen, if it disagreed so completely with the Ninth Circuit's application of these principles. Yet, this is seemingly what the majority must conclude.[6]
 
 
 63
 It is my view therefore that the approach taken by the Ninth Circuit in Cohen has been explicitly approved by Couch and comports fully with the fifth amendment view embraced by the Supreme Court, i.e., that possession, not ownership, is the significant factor and that the privilege protects one from having to produce the evidence, though not from its production.
 
 
 64
 Since the majority apparently does not dispute that the Goldsmiths had actual possession in a purely personal capacity,[7] the one question which remains unclear is whether the Goldsmiths had rightful possession. The lower court as I read its opinion, found it unnecessary to decide whether the Goldsmiths had been in 'rightful' possession because of its reading of United States v. Egenberg, 443 F.2d 512 (3d Cir. 1971).7a While the question of 'rightful' possession involves a conclusion of law, I would not deem it appropriate to draw a conclusion on this score from the limited factual findings below. As the Court in Cohen indicated, it is one thing for an accountant to relay to his client the existence of a demand of the government and to say, in effect, 'I will produce them if you have no objection and will return them' It is quite another thing for an accountant to say 'I want to produce them and demand their return.' Yet either situation would be consistent with the facts found by the district court in this case. Accordingly, unless it can be said that the transference of the 'analyses' to attorney Fisher bars the assertion of the Goldsmiths' fifth amendment privilege, I would remand to permit the lower court, with or without additional testimony at its discretion, to make additional findings of fact and conclusions of law.
 
 II.
 
 65
 Notwithstanding the transference of the 'analyses' to their attorney, the Goldsmiths retained constructive possession enabling them to assert their fifth amendment privilege.
 
 
 66
 The Supreme Court in Couch expressly rejected a per se rule that only actual possession would enable one to successfully assert the fifth amendment privilege.[8] The Court noted that 'situations may arise where constructive possession is so clear or the relinquishment of possession is so temporary and insignificant as to leave the personal compulsions upon the accused substantially intact.' 409 U.S. at 333.
 
 
 67
 Neither in Couch nor in any other case called to our attention has the Supreme Court engaged in such an analysis in the context of an attorney-client relationship.[9] The lower federal courts which have considered the matter have reached varying results.[10] The government contends that the presence of such a relationship is irrelevant because appellants, at this stage, disavow any reliance on the attorney-client privilege. While this contention accurately reflects the position of appellants before us,[11] I am compelled to disagree with the government's conclusion. Where there was a temporary surrender of actual possession pursuant to an attorney-client relationship, the nature of that relationship is of crucial importance in determining what a citizen has relinquished by the transfer and what he has retained.[12]
 
 
 68
 In Couch the taxpayer had surrendered actual possession to her accountant in the regular course of a long term business relationship. The accountant was an independent contractor engaged to perform a service; the service was the preparation of tax returns. The purpose of the surrender involved public disclosure. Justice Powell's opinion stresses this fact and its consequences:
 
 
 69
 'In Boyd, a pre-income tax case, the Court spoke of protection of privacy, 116 U.S. at 630, 6 S.Ct. (524), at 532, but there can be little expectation of privacy where records are handed to an accountant, knowing that mandatory disclosure of much of the information therein is required in an income tax return. What information is not disclosed is largely in the accountant's discretion, not petitioner's. Indeed, the accountant himself risks criminal prosecution if he knowingly assists in the preparation of a false return. 26 U.S.C. 7602(2). His own need for self-protection would often require the right to disclose the information given him.'
 
 
 70
 In the case before us, the Goldsmiths surrendered the analyses to their attorney for the limited purpose of securing legal advice not with respect to the preparation of a tax return but rather with respect to a pending tax investigation.[13] The Goldsmiths' expectation was of cloistered scrutiny and consultation, not of public disclosure. They had the unqualified right to immediate possession;[14] they had the unqualified right to command and Fisher had the unqualified duty to obey.[15] No disclosure or other disposition of the papers could properly be made by Fisher without the Goldsmiths' approval.[16] In short, the Goldsmiths did nothing more than temporarily relinquish physical possession.
 
 
 71
 The government conceded in oral argument that the Goldsmiths would have retained the right to assert the privilege if they had stayed in Fisher's office while he examined the papers in their presence or if they had insisted on his reviewing the papers in their home. I believe such distinctions ignore the realities of the relationship between a client and his attorney and are wholly unrelated to the purposes of the fifth amendment privilege.
 
 
 72
 I think this is demonstrated by the logic of Judge Jertberg, writing for the majority in United States v. Judson, 322 F.2d 460 (9th Cir. 1963):
 
 
 73
 'Clearly, if the taxpayer in this case . . . had been subpoenaed and directed to produce the documents in question, he could have properly refused. The government concedes this. But instead of closeting himself with his myriad tax data drawn up around him, the taxpayer retained counsel. Quite predictably, in the course of the ensuing attorney-client relationship the pertinent records were turned over to the attorney. The government would have us hold that the taxpayer walked into his attorney's office unquestionably shielded with the Amendment's protection, and walked out with something less. 'The government states that the evil which the Fifth Amendment sought to prevent is not present when the prosecution seeks evidence of A's guilt from B. But this argument ignores the realities of the relationship existing where B is A's attorney. An attorney is his client's advocate. His function is to raise all the just and meritorious defenses his client has. No other 'third party,' nor 'agent,' nor 'representative' stands in such a unique relationship between the accused and the judicial process as does his attorney. He is the only person besides the client himself who is permitted to prepare and conduct the defense of the matter under investigation. The attorney and his client are so identical with respect to the function of the evidence and to the proceedings which call for its production that any distinction is mere sophistry. 'The very nature of the tax laws requires taxpayers to rely upon attorneys, and requires attorneys to rely, in turn, upon documentary indicia of their clients' financial affairs. In light of these realities a very real danger would be created if we were to sustain the government's position. That danger was apparent to Judge Murphy in Application of House, supra, when he spoke of 'heavy penalties.'
 
 
 74
 'The government has at its disposal inquisitorial powers and administrative procedures which it may invoke at its pleasure. If the government's position were sustained here, those powers could be utilized to stimulate a taxpayer's consultation with his attorney and the predictable transfer of his records. The government's powers could then be utilized to compel disclosure of those matters by the attorney whenever the taxpayer were not available to utter the magic words. In our judgment, the inherent power thus to compel indirectly an individual's self-incrimination is curbed by the Fifth Amendment as effectively as the power to compel the same result directly.16a
 
 
 75
 In my view, it is difficult to imagine a more compelling case of constructive possession where the personal compulsions upon the accused are left substantially intact.
 
 III.
 
 76
 I am thus left with a perplexing question which continues to linger in my mind after reading the majority opinion: what is the rationale on which the majority bases its decision? As far as I can discern, the majority opinion neither concludes that the Goldsmiths were without rightful possession in a purely personal capacity nor concludes that the Goldsmiths were stripped of personal compulsions by the transference of the 'analyses' to their attorney. While these are essentially the propositions which the majority initially suggests the appellants must sustain, the majority appears never to reach them.
 
 
 77
 As I read the majority, whether there was rightful possession in a purely personal capacity or whether the personal compulsions on the Goldsmiths were left intact notwithstanding the transference of the 'analyses' are questions which need not be reached, if the documents possessed by the Goldsmiths did not 'have the capacity of coming within the penumbra of the Boyd ('private book and papers') rule.'[17] The majority states:
 
 
 78
 'Thus, if the taxpayers are to success in their effort, they must prove that their brief experience of actual possession for a limited purpose coupled with turning their accountant's records over to their attorney has the legal capacity to generate a subsequent right of constructive possession of sufficient intensity to elevate those records into the required category of their 'private books and papers.' We are unwilling to attribute a Fifth Amendment protection to the accountant's work product based on such a limited possession by his client.'[18]
 
 
 79
 If this is a statement of the holding in this case, I find it unhelpful and fear that it will create uncertainty for lower courts seeking to interpret it.
 
 
 80
 Does the majority hold that 'personal compulsion,' which they recognize is forbidden by the fifth amendment, is dissipated when actual possession is only 'limited' or 'brief'? Does the majority hold that what is significant for fifth amendment analysis is the Goldsmiths' intent, i.e., the 'limited purpose' for which they obtained the 'analyses'? Does the majority hold that because the 'analyses' were not protected by the privilege while in the possession of the accountant, the Goldsmiths' fifth amendment privilege was forever lost because they could no longer have reasonable expectations of privacy in the 'analyses'? These questions have immense ramifications for purposes of fifth amendment analysis.
 
 
 81
 Lastly, as a constitutional standard, I find the following statement by the majority vague and obscure, as well as at variance with Couch:
 
 
 82
 'possession of sufficient intensity to elevate those records into the required category of their 'private books and papers."
 
 
 83
 The majority initially recognizes that the privilege may apply where 'books and papers' are 'possessed' rightfully in a purely personal capacity.[19] White, Couch and Cohen, supra, support this view. Yet the majority appears unwilling to apply this rule, but rather reverts to the Boyd standard. Not only do I disagree with this approach, but I find it subject to various interpretations.
 
 
 84
 If by stating that possession must be of 'sufficient intensity' to elevate the 'analyses' to the level of 'private books and papers,' the majority is requiring ownership of the 'analyses,'[20] I believe Couch has now clearly decreed otherwise.
 
 
 85
 If by 'private' the majority is referring to the origin of the papers at issue, I believe its reliance on Boyd is misplaced. In Boyd the privilege was sustained with respect to business invoices prepared and previously published by a party other than the citizen asserting the privilege.[21]
 
 
 86
 If by 'private,' the majority is referring to 'books and papers' in which a person has reasonable expectations of privacy, I again disagree. It is true Couch spoke of reasonable expectations of privacy, but it did so in a fourth amendment context solely with reference to whether the expectations of privacy accompanying the taxpayers' transference of records to his accountant were such that the taxpayer retained constructive possession. Couch did not suggest that expectations of privacy were relevant to the issue of whether 'books and papers' are possessed rightfully in a purely personal capacity. Moreover, Couch's approval of Cohen supports this view. Lastly, it is for less evident to me, than the majority suggests without further elaborating, that there has been a "shift in emphasis from property to privacy' in the (Supreme) Court's treatment of the Fifth Amendment in compelled production of documents.'[22] If anything, Couch represents, in my view, a shift from ownership to possession. In any event, in the absence of a fourth amendment claim, it simply is not readily apparent to me how prior Supreme Court cases justify this engrafting of privacy principles onto the fifth amendment privilege which is a protection against personal compulsion.[23]
 
 
 87
 I therefore respectfully dissent and conclude with this observation from Couch:
 
 
 88
 'The basic complaint of petitioner stems from the fact of divulgence of the possibly incriminating information, not from the manner in which or the person from whom it was extracted. Yet such divulgence, where it did not coerce the accused herself, is a necessary part of the process of law enforcement and tax investigation.'[24]
 
 
 89
 The Supreme Court has recognized the need to obtain information in connection with tax investigations, but within limits. Once the government attempts to extract this information from the accused, the fifth amendment protections are violated. As the majority aptly warns, 'we must never wander from the principle that what the Fifth Amendment prohibits is compelled incrimination.' And in my view, this compulsion remains substantially intact even though Goldsmiths transferred the 'analyses' to their attorney for purposes of legal representation.
 
 
 90
 I would therefore vacate and remand for a determination whether the Goldsmiths had rightful possession.
 
 
 
 [1]
 Berson could not remember the exact date, but estimated it to be 'the 4th or 5th of August . . ..'
 
 
 [2]
 Feldman testified that Berson 'said that he would contact Mr. Fisher and ask for return of his records in compliance with the summons.' Berson testified that he said he 'would speak to Mr. Goldsmith and find out whether he could return the records to me.' (I.e., Berson.)
 
 
 [3]
 The district court reasoned:
 The taxpayers, by way of their attorney, assert that, independent of the ownership concepts of the papers, they may raise the privilege against self-incrimination merely because of their rightful and indefinite possession of the papers, relying on United States v. Cohen, . . . (388 F.2d 464 (9th Cir. 1967)). However, the Third Circuit in United States v. Egenberg, 443 F.2d 512 (3rd Cir. 1971), held, inter alia, that where a third party has a superior right to possession of the papers, the witness cannot withhold them.
 The facts in the instant case, as presented before this Court, demonstrate that the papers were and are the property of the accountant. They only left his possession after the taxpayer learned of the investigation. The transfer of the papers seems to indicate that this was an attempt to thwart the government's investigation. Of course, there is no attorney-client privilege which would be claimed since the accountant's transfer of non-privileged papers to the client would not create a privilege when the client turned the papers over to his attorney. See United States v. Kelly, 311 F.Supp. 1216 (E.D.Pa.1969). For the above reasons, the production of the documents in question is hereby ordered. 352 F.Supp. 731, 734-735 (E.D.Pa.1972).
 
 
 [4]
 Section 7602 of the Internal Revenue Code provides:
 For the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability, the Secretary or his delegate is authorized--
 (1) To examine any books, papers, records, or other data which may be relevant or material to such inquiry;
 (2) To summon the person liable for tax or required to perform the act, or any officer or employee of such person, or any person having possession, custody, or care of books of account containing entries relating to the business of the person liable for tax or required to perform the act, or any other person the Secretary or his delegate may deem proper, to appear before the Secretary or his delegate at a time and place named in the summons and to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry; and
 (3) To take such testimony of the person concerned, under oath, as may be relevant or material to such inquiry.
 
 
 [5]
 The statement reads:
 The Intelligence Division enforces the criminal statutes applicable to income, estate, gift, employment and excise tax laws (except those relating to alcohol, tobacco, narcotics and certain firearms), by developing information concerning alleged criminal violations thereof, evaluating allegations and indications of such violations to determine investigations to be undertaken, investigating suspected criminal violations of such laws, recommending prosecution when warranted, and measuring effectiveness of the investigation and prosecution processes. The Division assists other Intelligence offices in special inquiries, drives and compliance programs and in the normal enforcement programs, including those combating organized wagering, racketeering and other illegal activity, by providing investigative resources upon regional or National Office request. It also assists U.S. attorneys and Regional Counsel in the processing of Intelligence cases, including the preparation for and trial of cases.
 
 
 [36]
 Fed.Reg. 887 (1971)
 
 
 [6]
 400 U.S. at 535-536. In Couch v. United States, supra 409 U.S. at 326 n. 8 (1973), the Supreme Court emphasized that 'Donaldson cautioned only that the summons be issued in good faith and prior to a recommendation for criminal prosecution.' On this record, as in Couch, 'neither of those conditions is successfully challenged here.'
 
 
 [7]
 'It is the responsibility of an appellate court to accept the ultimate factual determination of the fact-finder unless that determination either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data. Unless the reviewing court establishes the existence of either of these factors, it may not alter the facts found by the trial court. To hold otherwise would be to permit a substitution by the reviewing court of its finding for that of the trial court, and there is no existing authority for this in the federal judicial system, either by American common law tradition or by rule and statute.'
 
 
 [8]
 Berson testified that personnel in his accounting firm prepared the 'analyses' under his direction; that they were used, among other things, to prepare various tax returns; and that the records remained in his possession and are usually forwarded to the client every three or four years because the accumulation gets out of hand. (App. at 65-66.) Berson also testified he had an 'understanding' for over twenty-five years with the Goldsmiths that the 'anlayses' belonged to the client, and he regarded them as 'client's papers.' Goldsmith testified the cash receipts and disbursement records which formed the basis for the 'analyses' were regarded as his property. When asked specifically as to the ownership of the 'analyses,' his answer was not responsive:
 Q. With respect to the cash receipts and cash disbursements records for your business did you regard them as your property or Mr. Berson's property?
 A. I would regard them as my property.
 Q. Did you have an understanding or agreement with Mr. Berson that they were your property?
 A. I say yes because for the last thirty years that he has been keeping my books they have been returned to me.
 Q. And any time you asked for them you were given them?
 A. Many times Mr. Berson would ask me to come and please take them because he didn't have room.
 Q. Mr. Goldsmith, would you tell me what the substance of that agreement between yourself and Mr. Berson is with respect to the cash receipts and disbursements analysis?
 A. I submit them to Mr. Berson and from that he determines my tax. I have been doing this for the last twenty-five, thirty years.
 Q. I see. And do you have a written agreement with Mr. Berson with respect to whose property these records will be after they are prepared?
 A. No, sir.
 (App. at 85-87.)
 Special Agent Feldman's testimony directly contradicted that of Berson. Feldman testified;
 Q. And isn't it also a fact that by the time you got around to serving a summons on Mr. Fisher that you had ascertained from Mr. Berson just what work papers he had prepared?
 A. He told me exactly what he had prepared and that is what I put on the summons.
 Q. He also told you that they were his work papers, did he not?
 A. That's correct.
 (App. at 60-61).
 Faced with testimony that an accounting firm prepared the 'analyses'; that they usually remained in the possession of the firm for a period of time; that the records were requested by the taxpayer after Feldman had sought to set up an appointment with Morris Goldsmith; that Berson called Goldsmith after Berson was served with the summons and told him that he would like to get the papers back; and that Feldman's and Berson's testimony concerning the ownership of the papers was in direct conflict, the court determined as a fact that the 'analyses' were the property of the accountant. This finding is not completely devoid of minimum evidentiary support displaying some hue of credibility; not does it lack a rational relationship to the supporting evidentiary data. Krasnov v. Dinan, supra. Thus, we will not disturb it.
 
 
 [9]
 McCulloch v. Maryland, 4 Wheat. 316, 407, 4 L.Ed. 579 (1819)
 
 
 [10]
 Moreover, this argument finds little support today. See Judge Friendly's scholarly treatment in In re Horowitz, 482 F.2d 72, 75-79 (2d Cir.), cert. denied, 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973), and in The Fifth Amendment Tomorrow: The Case for Constitutional Change, 37 U.Cin.L.Rev. 671, 701-703 (1968)
 
 
 [11]
 Corporate and union records and records of at least certain partnerships actually possessed by the custodians in a representative rather than a personal capacity cannot be the subject of the personal privilege against self-incrimination. Bellis v. United States, supra; United States v. White, 322 U.S. 694, 699, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944); Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771 (1911). Incorporated banks, like other artificial organizations, have no privilege against compulsory self-incrimination. California Bankers Association v. Shultz, 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974)
 
 
 [12]
 There was also testimony that the 'analyses' were used by the Goldsmiths when the bank needed them for loan applications
 
 
 *
 A dissent suggests that the report of the blood test was 'testimonial' or 'communicative,' because the test was performed in order to obtain the testimony of others, communicating to the jury facts about petitioner's condition. Of course, all evidence received in court is 'testimonial' or 'communicative' if these words are thus used. But the Fifth Amendment relates only to acts on the part of the person to whom the privilege applies, and we use these words subject to the same limitations. A nod or head-shake is as much a 'testimonial' or 'communicative' act in this sense as are spoken words. But the terms as we use them do not apply to evidence of acts noncommunicative in nature as to the person asserting the privilege, even though, as here, such acts are compelled to obtain the testimony of others.' and that the withdrawal of blood and use of the analysis in question in this case did not involve compulsion to these ends
 
 
 [1]
 In his dissent, Justice Marshall summarized the accepted view of self-incrimination as pertaining to the compulsory production of documents (although he did not agree with this view)
 See also Douglas, J., dissenting, who stated,
 'I can see no basis in the majority opinion, however, for stopping short of condemning only those intrusions resting on compulsory process against the author of the thoughts or documents.' 409 U.S. at 341.
 
 
 [2]
 Goldsmith obtained the 'analyses' from Berson in early August of 1971 (Berson estimated the date to be 'the 4th or 5th of August') and turned them over to Fisher on August 17, 1971. The record therefore simply does not support the majority's statement
 
 
 [3]
 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944). White involved a union official who, having possession of union records, refused to honor a subpoena for their production on the grounds that they would incriminate him. The Supreme Court in White rejected this argument because the union official possessed the records in only an agency capacity
 
 
 [4]
 Couch's emphasis of this language in White is particularly significant in view of several statements by the majority which suggests its reluctance to grapple with the italicized language in the text. See infra
 
 
 [5]
 In Cohen a subpoena had been served on the taxpayer who was in possession of workpapers owned by his accountant
 
 
 [6]
 Of course, if the majority finds there is no constructive possession, the Cohen question need not be reached. The majority, however, apparently professes to reach the Cohen question first:
 'the claim to the Fifth Amendment privilege must emanate from the taxpayer's rights. And in the attorney-client relationship, the rights must flow upward from the taxpayer; not downward from the attorney.'
 I agree with this statement only in the sense that constructive possession cannot be found unless there first is rightful actual possession in a purely personal capacity.
 
 
 [7]
 It is undisputed that the 'analyses' were prepared for the Goldsmiths from their own records and papers and pertained to their own business affairs. They obtained the 'analyses' from Berson for their own personal purposes and did not hold them in furtherance of any objective of Berson, or as agent of Berson
 7a See note 20 infra.
 
 
 [8]
 409 U.S. at 336 n. 20
 
 
 [9]
 While standing alone it would be a slender reed, indeed, the court did make a comment in Couch which can be read to indicate a material difference between the accountant-client and the attorney-client relationship:
 'Technically the order to produce the records was directed to petitioner's attorney since, after the summons was served upon the accountant, he ignored it and surrendered the records to the attorney. But constitutional rights obviously cannot be enlarged by this kind of action. The rights and obligations of the parties became fixed when the summons was served, and the transfer did not alter them.' 409 U.S. at 322, 329 n. 9, 93 S.Ct. 611, 616, 34 L.Ed.2d 548 (1973).
 
 
 [10]
 Compare United States v. Judson, 322 F.2d 460 (9th Cir. 1963), Colton v. United States, 306 F.2d at 633 (2nd Cir. 1962) and Application of House, 144 F.Supp. 95 (N.D.Cal.1956) with United States v. White, 477 F.2d 757 (5th Cir. 1973) (dissenting opinion). In re Fahey, 300 F.2d 383 (6th Cir. 1961) and United States v. Boccuto, 175 F.Supp. 886 (D.N.J.) appeal dismissed, 274 F.2d 860 (3d Cir. 1959)
 
 
 [11]
 It is conceded by appellants that the lawyer-client privilege is inapplicable here. The authorities would seem to support the proposition that a document prepared by a tax accountant from bank records prior to the creation of an attorney-client relationship and given thereafter by the client to his attorney is not within the scope of the privilege. See, e.g., Bouschor v. United States, 316 F.2d 451 (8th Cir. 1963); Sale v. United States, 228 F.2d 682 (8th Cir. 1956); United States v. Kelly, 311 F.Supp. 1216 (E.D.Pa.1969)
 
 
 [12]
 Justice Marshall, dissenting in Couch, stated:
 'A transfer to a lawyer is protected, not simply because there is a recognized attorney-client privilege, but also because the ordinary expectation is that the lawyer will not further publicize what he has been given.' 409 U.S. at 350.
 
 
 [13]
 Although the Goldsmiths have alleged on this appeal that they transferred the 'analyses' for the limited purpose of securing legal advice with respect to the pending tax investigation (government does not dispute), the record is less specific. Although this presents no problem for me, at the very most a remand for such a finding would be necessary
 
 
 [14]
 The only qualification of this right of a client would appear to be an attorney's lien. No suggestion is made that this exception is applicable here
 
 
 [15]
 One could predict with some confidence that these realities of control would not be ignored in a case where a subpoena had been served on a taxpayer and he resisted production on the ground that he had given the records sought to his attorney. Cf. First National City Bank of N.Y. v. I.R.S., 271 F.2d 616 (2nd Cir. 1959); Hopson v. United States, 79 F.2d 302 (2nd Cir. 1935); United States v. Howard, 360 F.2d 373, 381 (3d Cir. 1966)
 
 
 [16]
 As Judge Ainsworth noted in his dissenting opinion in United States v. White, 477 F.2d 757, 766 n. 6 (5th Cir. 1973):
 'The new ABA Code of Professional Responsibility in its Ethical Consideration 4-4 notes: 'The attorney-client privilege is more limited than the ethical obligation of a lawyer to guard the confidences and secrets of his client. This ethical precept, unlike the evidentiary privilege, exists without regard to the nature or source of information or the fact that others share the knowledge."
 16a United States v. Judson, 322 F.2d 460, 466-468 (9th Cir. 1963). As Judge Jertberg also pointed out, the law has traditionally considered the client and his attorney as one in matters relating to the compulsory production of documents. As Professor Wigmore records:
 '. . . (W)hen the client himself would be privileged from protection of the document, * * * as exempt from self-incrimination, the attorney having possession of the document is not bound to produce. Such has invariably been the ruling. On the other hand, if the client would be compellable to produce * * * then the attorney is equally compellable, if the document is in his custody, to produce under the appropriate procedure,' 8 Wigmore, Evidence 2307 (McNaughton Rev. 1961).
 See also Colton v. United States, 306 F.2d 633, 639 (2nd Cir. 1962) and Brody v. United States, 243 F.2d 378, 387 (1st Cir. 1957).
 
 
 [17]
 Majority opinion at 691
 
 
 [18]
 Majority opinion at 692
 
 
 [19]
 Majority opinion at 689-691
 
 
 [20]
 I note particularly that the majority reaffirms United States v. Egenberg. 443 F.2d 512 (3d Cir. 1971), in a manner which may be read to suggest that Egenberg's 'superior right' theory has survived Couch intact. If this is what the majority implies, I disagree. In my view Couch does not undercut the result in Egenberg but only because Egenberg involved possession in an agency rather than personal capacity
 
 
 [21]
 As the Supreme Court noted in Wilson v. United States, 221 U.S. 221, 378, 31 S.Ct. 538, 543, 55 L.Ed. 771 (1911), 'where one's private documents would tend to incriminate him, the privilege exists although they were actually written by another person.' See note 1 supra (excerpt from Justice Douglas' dissent in Couch)
 
 
 [22]
 Majority opinion at 690
 
 
 [23]
 A careful reading of Couch reveals the distinction the Supreme Court maintained between the fourth and fifth amendment protections:
 'We hold today that no (1) Fourth of (2) Fifth Amendment claim can prevail where, as in this case, there exists (1) no legitimate expectation of privacy and (2) no semblance of governmental compulsion against the person of the accused.' 409 U.S. 336.
 
 
 [24]
 409 U.S. at 329