**UNITED STATES of America,**
**Appellee,**

v.

**Daniel A. ANTOLINI, III, Appellant.**

**No. 04–3410.**

United States Court of Appeals,
Third Circuit.

Submitted Under Third Circuit
LAR 34.1(a) March 6, 2008.

Filed: April 1, 2008.

George S. Leone, Office of United States Attorney, Newark, NJ, for Appellee.

Mark W. Catanzaro, German, Gallagher & Murtagh, Moorestown, NJ, for Appellant.

Daniel A. Antolini, III, Moorestown, NJ, pro se.

Before: BARRY, JORDAN, and HARDIMAN, Circuit Judges.

## OPINION OF THE COURT

HARDIMAN, Circuit Judge.

Daniel Antolini appeals his conviction and sentence on nine counts of wire fraud, bank fraud, structuring transactions, and tax evasion. We will affirm.

### I.

As we write for the parties alone, we recount only the facts necessary to our decision. We review the facts in the light most favorable to the Government, as the verdict winner. *United States v. Haddy*, 134 F.3d 542, 544 (3d Cir.1998).

Antolini owned Executive Cash Services, Inc. (ECS), which contracted with banks to keep their automated teller machines (ATMs) operational and funded. Banks wired money to an ECS transit account from which ECS withdrew cash to fill ATM cassettes. ECS then removed depleted cassettes from ATMs and replaced them with replenished ones. The cash remaining in the old cassettes was transported to ECS, counted, and returned to the banks via check.

This process provided ECS (and Antolini) with a substantial cash float because ECS required its customers to wire funds to the transit account 48 hours prior to ATM replenishment and the unused cash was not returned until several days later. From 1995 to 1999, Antolini withdrew $972,729 from the transit account that he used to purchase a gas station, a company airplane, a motorcycle, and a boat; he paid off a mortgage on his New Jersey home, made a down payment on a Florida home, and invested more than $350,000 in brokerage accounts.

Antolini's scheme began to unravel when CoreStates Bank hired ECS to replenish its ATMs. CoreStates entrusted ECS with over $118 million in February of 1997, but after only a few months, ECS could not

account for over $4 million. CoreStates terminated the contract and sued ECS in federal court. Antolini's counsel, Eric Browndorf, told CoreStates that the shortfall occurred because banks owed ECS money. Without mentioning Antolini's misappropriations, Browndorf told CoreStates that ECS's books were "a mess" and that Antolini was insolvent.

On September 4, 1997, CoreStates agreed to team with ECS in a "joint recovery effort," and ECS hired the accounting firm of Capaldi, Reynolds & Associates (Capaldi) to lead the effort. After Antolini's counsel informed CoreStates that Antolini could no longer afford Capaldi's retainer, CoreStates assumed payment out of a trust account created in furtherance of the joint recovery effort.

Browndorf memorialized this unusual three-way relationship in a series of letters to Capaldi. First, he instructed Capaldi to share with CoreStates only the information necessary to recover funds from other banks, writing: "We are not sharing all of your work papers, findings or reports with them." Second, Browndorf informed Capaldi that CoreStates' counsel was to be excluded from a meeting with ECS's insurer (Lloyd's of London) at which the parties verified CoreStates' loss. Third, on March 10, 1998, Browndorf wrote Capaldi: "How did the meeting go with CoreStates? Please be cooperative, but cautious. At the end of the day it is still likely that [Antolini] will have a battle with them over the deficiency."

In February of 1998, ECS and CoreStates entered into a settlement agreement in which CoreStates agreed to pursue ECS's customers and Lloyd's of London before turning to ECS to recover its loss. After CoreStates' requests for records were rebuffed by ECS, however, CoreStates terminated its participation in the joint recovery effort with $2 million remaining unrecovered.

A grand jury indicted Antolini on 13 counts: (a) seven counts of wire fraud in violation of 18 U.S.C. § 1343 and § 2, (b) one count of bank fraud in violation of 18 U.S.C. § 1344 and § 2, (c) one count of structuring transactions to evade reporting requirements in violation of 31 U.S.C. § 5324(a)(3) and 31 C.F.R. §§ 103.22 and 103.27, and (d) four counts of tax evasion in violation of 26 U.S.C. § 7201.

During trial, Antolini's counsel (who was not Browndorf) noted during his closing argument that Antolini's former colleague, Barry Chesla, had pleaded guilty to stealing ATM funds while working at ECS and other companies. The defense introduced the plea to suggest that Chesla—not Antolini—was responsible for CoreStates' loss. In response, the government argued that Chesla was a "red herring" because he stole very little from ECS. The government recounted Chesla's fraudulent activities and asked the jury: "sound familiar?" The District Court ordered the jury to disregard this remark by the prosecutor and explained the purpose for which they could consider Chesla's plea.

## II.

 Antolini first argues that the attorney-client privilege should have protected the letters Eric Browndorf sent to Capaldi. We reject this argument at least two independent reasons. First, Antolini cannot waive the privilege with respect to Capaldi's efforts to identify banks that ECS should pursue while preserving the privilege with respect to Capaldi's efforts to discern ECS's debt to CoreStates. *Westinghouse Elec. Corp. v. Republic of the Philippines*, 951 F.2d 1414, 1426 n. 13 (3d Cir.1991). Because both issues relate to the joint recovery effort, a partial waiver would allow Antolini "to present a one-sided story to the court." *Id.* Therefore, Antolini waived whatever privilege may

have existed between himself and Capaldi when he invited CoreStates to join the recovery effort.[1] *See id.* at 1424.

■ Second, the letters were only relevant to Count 8 of the superceding indictment (bank fraud), and therefore, their admission was harmless vís-a-vís the other eight counts of conviction. *Marshall v. Hendricks,* 307 F.3d 36, 73 (3d Cir.2002). Moreover, as the letters were duplicative of other, substantial evidence of Antolini's bank fraud, their admission was harmless vís-a-vís Count 8. *See id.* at 73–74.[2]

In light of the foregoing, we hold that the District Court did not abuse its discretion in permitting disclosure of Browndorf's letters. *See United States v. Doe,* 429 F.3d 450, 452 (3d Cir.2005).

## III.

■ Antolini also argues that the prosecutor's comments about Barry Chesla during closing arguments entitle him to a new trial. We find that even if the prosecutor's comments were prejudicial—and we do not decide that they were—the following curative instruction vitiated any prejudice:

> [I]n the government's closing argument they refer to Barry Chesla ... and [his] guilty plea in the Western District of Pennsylvania. The evidence was offered by the defense in accordance with the defense theory of the case, which is set forth at Page 19 of my instructions. That is the only purpose for which the defense offered it. * * * The government was responding to that and asserting that it was a red herring. * * * The government said, talking about [Barry Chesla], "Does that sound familiar?" Disregard that remark. * * * [A] person's decision to plead guilty is a personal decision about their own guilt and is not evidence of any sort against any person here on trial.

The District Court did not abuse its discretion when it denied Antolini's motion for a new trial. *See United States v. Gambino,* 926 F.2d 1355, 1365 (3d Cir.1991).

Finally, in light of the Rule 28(j) letter in which Antolini withdrew his initial request for resentencing pursuant to *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), we do not address that claim and will affirm the judgment of the District Court in all respects.

---

1. Indeed, we question whether the attorney-client privilege existed here in the first instance. There is no *accountant*-client privilege. *See Couch v. United States,* 409 U.S. 322, 334, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973). Rather, where the client, or the client's attorney, retains an accountant for the purpose of obtaining or providing legal advice, the *attorney*-client privilege may attach. *See United States v. Kovel,* 296 F.2d 918, 922 (2d Cir.1961); *United States v. Alvarez,* 519 F.2d 1036, 1045 (3d Cir.1975); *United States v. Fisher,* 500 F.2d 683, 691–92 (3d Cir.1974). However, "[i]f what is sought is not legal advice but only accounting service ... or if the advice sought is the accountant's rather than the lawyer's, no privilege exists." *Kovel,* 296 F.2d at 922. Here, Browndorf hired Capaldi primarily for accounting services and advice, which calls into question whether *Kovel* applies.

2. We also reject Antolini's argument that the letters were irrelevant to the question of whether he knowingly defrauded CoreStates. As discussed, the letters showed that Antolini knew that material information was being withheld from CoreStates. The District Court did not abuse its discretion in finding this evidence relevant and not unfairly prejudicial. *See Elcock v. Kmart Corp.,* 233 F.3d 734, 754 (3d Cir.2000).